THE STATE ex rel. MISSOURI SOUTHERN RAILROAD COMPANY v. PUBLIC SERVICE COMMISSION OF MISSOURI.

In Banc, July 2, 1914.

1. **PUBLIC UTILITIES ACT: Interpretation.** The Public Utilities Act of 1913 evidences a departure (or at least an advanced thought) in public policy in dealing with common carriers and public utilities, and touches, at so many vital points, so many vital and open questions, and is such a brave and deserving attempt to provide a speedy and sensible scheme for settling controversies, prevalent, obstinate, old, raw and inflamed, that wisdom demands that its judicial construction proceed with discriminating caution; and it is so vast and intricate, that it cannot be construed all at once, and hence the better course is to build up a construction step by step, and to that end decide nothing except what is precisely necessary to a determination of vital questions raised in each concrete case.

2. ————: **Liberally Construed: Caution.** The Public Utilities Act of 1913 is to be liberally construed to further its life and purpose; in fact, it fixes its own rule of interpretation, wherein it says (Sec. 127) it "shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities;" and the ground on which a judgment thereunder is to rest being new, courts should sound at every step and look to the past as well as the future to get the right point of view and see if the ground is solid.

3. ————: **Harmonious Whole: Related Provisions.** The words in one section of a statute are to be construed in connection with other provisions relating to the same subject-matter; and

the intendment and scope of an act are of value in illuminating any particular provision thereof.

4. ————: **Scope: Railroad Rates.** A survey of the whole of the Public Utilities Act of 1913 demonstrates that it was intended to occupy the entire field on given phases relating to rates that may be charged by common carriers and other public utilities and the service to be rendered by them.

5. ————: ————: **Requirement for Equipment and Service: Implies Power to Fix Charges.** It is to be expected in every well-rounded utilities act which invests in a functionary ot the State power to prescribe and coerce service and equipment, that it also contains corresponding provisions vesting such functionary with power to regulate income and fixed charges.

6. ————: **Railroad Rates.** The Public Utilities Act of 1913 (Sec. 47) delegated to the Public Service Commission power to fix and enforce railroad passenger or freight rates, either above the maximum or below the minimum rates fixed by former legislative enactments, whenever, in any particular case, such existing rates do not provide a "reasonable average return on the value of the property actually used in the public service" by the corporation.

7. ————: **Public Service Commission: Legislative and Judicial Powers.** The Public Service Commission has neither judicial nor legislative powers, but is a part of the administrative arm of the government, and as such has no power to repeal a statute or declare it unconstitutional; but it does have power upon inquiry and careful investigation, to exercise the legislative function delegated to it to fix railroad rates, either by increasing or decreasing them, according to the principles of justice prescribed by the act, and to enforce those rates; but until it exercises that power, the prior rates fixed by statute remain in force.

## Mandamus.

Writ allowed.

*J. B. Daniels* for relator; *E. A. Rozier, O. L. Cravens, R. A. Hope, Thomas R. Morrow, S. H. West, S. W. Moore, O. M. Spencer, J. M. Bryson, J. W. Jamison, W. F. Evans, J. L. Minnis, R. A. Brown, Lon O. Hocker, Martin L. Clardy, T. L. Philips,* of counsel.

(1) All of that part of section 47 of the Public Service Commission Act of the State of Missouri un-

der consideration in this case was copied *verbatim* from the Public Service Commissions Law of the State of New York, and in adopting the language of the New York statute the Legislature is presumed to have adopted the interpretation theretofore placed upon it by the commissions and courts of New York. Laws New York, 1907, chap. 429; Laws New York, 1910, chap. 480; Laws New York, 1911, chap. 546; Knight v. Rawlings, 205 Mo. 412; State ex rel. v. Miles, 210 Mo. 146; Skouten v. Wood, 57 Mo. 380; Skrainka v. Allen, 76 Mo. 389; Snyder v. Railroad, 86 Mo. 613.    (2) Both the Public Service Commission of the State of New York and the Appellate Division of the Supreme Court of that State had construed the law now before this court for construction prior to its enactment in this State, and had construed it to confer upon the Commission power to change statutory rates, and this construction was placed upon it when the law of New York was, as originally enacted in 1907, and when it did not contain the clause "notwithstanding that a higher rate, fare or charge has heretofore been authorized by statute."    2 Public Service Commission Rep. N. Y., 2 District, 78; 140 App. Div. (N. Y.) 839.    (3) All statutes of Missouri fixing maximum charges for carriage of freight and passengers are repealed by the Law of 1913, creating the Public Service Commission, because they are in conflict with the last-mentioned law, at least in so far as they undertake to prescribe charges that may not be increased.    The purpose of the Act of 1913, creating the Public Service Commission was to create an administrative board that should have the power from time to time to fix all charges for carrying freight and passengers regardless of any previous laws. Henderson's Tobacco Company, 11 Wall. 657; Mining, etc. Co. v. Gardner, 173 U. S. 123; Constitution of Mo., art. 13, sec. 14; Laws 1875, 112; R. S. 1899, secs. 1192, 1194; Laws 1887, p. 17; R. S. 1899, sec. 1136; Laws 1903, p. 132; R. S. 1909, secs. 3187,

3251, 3252, 3253; Laws 1911, p. 162; Coal Co. v. Railroad, 52 Fed. 716; Railroad v. Jones, 37 N. E. 247; Railroad Com. v. Railroad, 170 Fed. 225; Gregg v. Laird, 87 Atl. 1111. (4) If the legislative intent was to authorize the commission to reduce rates below the maximum rates prescribed by statute without conferring upon it the power to increase rates above such statutory rates, the enactment is void because it deprives the petitioner of the equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States, and deprives it of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and in violation of section 30 of article 2 of the Constitution of the State of Missouri. Railroad Commission Cases, 116 U. S. 331; Dow v. Beidelman, 125 U. S. 689; Railroad v. Minnesota, 134 U. S. 458; Reagan v. Loan & Trust Co., 154 U. S. 399; Smyth v. Ames, 169 U. S. 466; Railroad v. Railroad Commission, 196 Fed. 800; Trustees v. Gas E. L. & P. Co., 191 N. Y. 123. (5) If the maximum freight or passenger rates, or the maximum freight and passenger rates prescribed by the statutory laws of the State of Missouri in effect on and prior to March 16, 1913, are in fact confiscatory of the property of petitioner (and for the purpose of this case they must be presumed to be), such laws as to this petitioner were and are void, and do not constitute a bar to the right of the commission to fix rates. Authorities under point 4. (6) If section 47 of the Public Service Commission Act is susceptible of two constructions, one of which renders said section violative of the petitioner's constitutional rights, and is therefore void, the court will adopt that construction which will sustain and uphold the statute rather than the construction which would render it void. Gregg v. Laird, 87 Atl. 1111; State ex rel. v. Mason, 153 Mo. 23; Kenefick v. St. Louis, 127 Mo. 1; People v. Bradley, 207 N. Y. 592;

U. S. v. Delaware & Hudson Co., 213 U. S. 366; Bank v. Des Moines, 205 U. S. 511.

*E. J. Bean* for respondent.

(1) The Public Service Commission law did not repeal sections 3232, 3241, 3244, 3246, Revised Statutes 1909; therefore, the Public Service Commission had no authority to permit relator to increase its rates and charges above the amounts fixed by the statutes of this State, and the demurrer of respondent should be sustained. Sections 3232, 3240, 3241, 3244, 3246, 3258, R. S. 1909; Laws 1911, p. 162; 1 Lewis's Sutherland, Statutory Construction (2 Ed.), 465; McGrew v. Railroad, 177 Mo. 542; State ex rel. v. Walbridge, 119 Mo. 389; Manker v. Faulhaber, 94 Mo. 439. (2) Authority cannot lawfully be delegated to the Public Service Commission to repeal a statute which establishes and fixes a maximum rate for railroad rates or charges. Railway v. Railroad Commission, 161 Fed. 985; Field v. Clark, 143 U. S. 694. The Legislature may not delegate its purely legislative power to a commission, but having laid down the general rules of action under which a commission shall proceed it may require of that commission the application of such rules to particular situations and the investigation of facts with a view to making orders in a particular matter within the rules laid down by the Legislature. Interstate Commerce Commission v. Transit Co., 224 U. S. 194; Railroad v. Gill, 156 U. S. 663; Reagan v. Farmers L. & T. Co., 154 U. S. 362. (3) The Public Service Commission is an administrative body and has no judicial power, hence it cannot adjudge the maximum rate laws unconstitutional because confiscatory to the relator.

LAMM, C. J.—Mandamus. Original proceeding.

Relator is a domestic corporation owning and operating, as a common carrier of freight and passen-

gers, a railroad of fifty-four miles in this·State, beginning at the town of Leeper in Wayne county and running thence northwestwardly through parts of Wayne and Reynolds, ending at the town of Bunker in the latter.

In July, 1913, relator as petitioner made to, and filed a complaint with, the Public Service Commission. That complaint was under the Public Utilities Act. [Laws 1913, pp. 557-651.] In substance it set forth relator's domestic incorporation as a railroad company, its ownership and operation of a railroad wholly within the State and more than forty-five miles in length; that it was engaged in the business of transporting freight and passengers as a common carrier for hire; that under authorized rates prior to 1905 its earnings for such service produced a sum barely sufficient to meet the cost and expenses of the service, thereby resulting in an inability to create any reserve therefrom for surplus or contingencies, and an impossibility of making a reasonable return on the value of the property actually used in the service; that the rates designated by the Act of 1907 for freight and the maximum of two cents per mile for passengers would be insufficient to yield any compensation therefor and would be unreasonable, unjust and confiscatory; that it was entitled by law to a reasonable average return on the value of the property actually used in its public service, and further entitled to a reservation from its income of a sum sufficient to keep its property in a fair state of repair, and also sufficient for surplus and contingencies; that its road lies in a rough country, has sharp curves and heavy grades, and that the population served by it is limited and scattered; that the rates prescribed by statute are insufficient to meet the actual cost of operation; and that the complaint is under section 47 of the Public Utilities Act of 1913.

It then went on to ask the commission to increase relator's service rates above those prescribed by stat-

ute and to determine the just and reasonable compensation which petitioner thereafter would be entitled to receive for that service, and, to that end, that a hearing be granted, etc.

The complaint filed before the commission was verified by affidavit and no question was made on its form or sufficiency in allegation of fact.

It seems, under protest and after filing that complaint, relator put into effect (under the orders of the commission) rates not in excess of the maximum ones prescribed by the Laws of 1907; that under protest it has continued such rates, although alleged to be unreasonable, unjust and confiscatory of relator's property. It appears (the commission doubting its own authority) that although relator pressed its complaint, it could get no hearing on the merits and that finally in April, 1914, the commission, having taken time to consider, reached a conclusion and entered its order refusing to hear evidence. Accordingly it dismissed the complaint, giving as reason (whereby weighty matter hangs, to-wit) that it had no power to allow or order an increase in rates in excess of the maximum rates prescribed by statute. The order recites, *inter alia,* that in its (the commission's) judgment it is without authority to grant the relief prayed, and this (quoting) "regardless of any evidence that may be submitted and" (regardless of) "the fact that complainant may show such rates, fares and charges to be unjust, unreasonable and confiscatory of its property."

Making averments and narrations to the effect above, relator made due application here for a writ of mandamus compelling the commission to proceed as speedily as practicable with the hearing of proofs to be offered in support of relator's said complaint and to make such findings as the proofs warrant without respect to the rates fixed by statute.

Waiving in writing notice or the service of a copy of the application for mandamus (*vide* rule thirty-

four) the commission entered its volutary appearance, .
waived issuance and service of an alternative writ,
agreeing that the petition be treated for all purposes
of the case as and for such alternative writ.

Presently respondent filed its demurrer based on
four grounds (the three last of which may be taken as
specifications of the first), to-wit, the first being that
the petition does not state facts sufficient to constitute
a cause of action. The question hinges on lack of au-
thority and this, in turn, involves questions of inter-
pretation, construction and repeal.

The statute most immediately held in judgment is
the first part of section 47 of said Public Utilities Act,
reading:

"Whenever the commission shall be of opinion,
after a hearing had upon its own motion or upon com-
plaint, that the rates, fares or charges demanded, ex-
acted, charged or collected by any common carrier,
railroad corporation or street railroad corporation for
the transportation of persons or property within the
State, or that the regulations or practices of such com-
mon carrier, railroad corporation or street railroad cor-
poration affecting such rates are unjust, unreasonable,
unjustly discriminatory or unduly preferential, or in
anywise in violation of any provisions of law, or that
the maximum rates, fares or charges, chargeable by
any such common carrier, railroad corporation or
street railroad corporation are insufficient to yield rea-
sonable compensation for the service rendered, and
are unjust and unreasonable, the commission shall with
due regard among other things to a reasonable aver-
age return upon the value of the property actually used
in the public service and to the necessity of making
reservation out of income for surplus and contingen-
cies, determine the just and reasonable rates, fares
and charges to be thereafter observed and in force as
the maximum to be charged for the service to be per-
formed, notwithstanding that a higher rate, fare or

charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed."

Other sections of that act and other statutes are somewhat drawn within the lines of the discussion and will be noticed so far as necessary in the course of the opinion.

The cause was submitted on arguments and briefs on the demurrer, hence the record presents a single and clean-cut issue of law, to-wit: Does the Public Utilities Act of 1913 give the commission power (if the facts ascertained on due hearing justify the exercise of it) to allow relator a freight and passenger rate in excess of that prescribed by elder statutes? If so, the absolute writ should issue. If not so, it should be denied.

I.  *Some pertinent generalizations as a foreword.*

(a)  The statute involved is new. Referable to the police power, it evidences a departure (or at least an advanced thought) in public policy in dealing with common carriers and public utilities in Missouri. It touches at so many vital points so many vital and open questions; it is such a brave and deserving attempt to provide a speedy and sensible scheme for settling controversies so prevalent, so obstinate, so old, so raw and inflamed between public utility companies and their patrons (to-wit, the public) that wisdom demands its judicial construction proceed with discriminating caution. It is so vast and intricate that it cannot be construed all at once and all doubts dispelled slap-dash in a lump as science now kills mosquitoes. The better course is to build up a construction by evolution, step by step and, to that end, decide nothing except what is precisely necessary to a determination of vital

questions raised in each concrete case. Peradventure by that safe and conservative course important phases of the statute will in an orderly way and in due time be digested and so assimilated by sound interpretation that all its remedies will eventually be advanced and all mischiefs within its purview be retarded.

The views of Mr. Justice MILLER, speaking for all his brethren, on the unwisdom of attempting an authoritative and complete definition of a phrase in the fourteenth amendment to the Federal Constitution are apposite, to-wit, that the annunciation of the principles which govern each case as it arises is the better mode of arriving at a sound definition. [Davidson v. New Orleans, 96 U. S. 97.]

(b) In one of its features (the duty of courts to relegate gas-rate controversies to the Public Service Commission in the first instance) the statute has been before this court once before. [State ex inf. Barker, Atty. Gen., v. Kansas City Gas Co., 254 Mo. 515.] We there held it was a highly remedial statute which, on well-settled legal principles, was to be liberally construed to further its life and purpose. It was pointed out that the lawmaker had written in his law his own rule of interpretation, to-wit, that it "shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities." [Sec. 127.] It was declared in that case that the proper judicial attitude toward the statute was not a frosty or a questioning one—*contra,* it was an attitude running on all-fours with the wise public policy evidenced by it. It is, I think, in the dry light of such doctrine the problem presented to us in the instant case must be solved.

When the ground on which a new judgment is to rest is new and unexplored, as here, it is well enough for courts to sound at every step and look to the past as well as the future to get the right point of view and to see if, peradventure, the ground is solid; but

after that has been said and everything else has been said that can well be said on the wisdom of judicial caution and circumspection where the situation is new, it should be allowed as good and acceptable doctrine that courts should not adhere to theories, however fond and familiar, when the lawmaker (within constitutional limitations) has exploded them by a new statute. Indeed in that behalf it is much the same as a philosopher has said of custom: "A forward retention of custom is as turbulent a thing as an innovation; and they that reverence too much old times are but a scorn to the new." [Bacon—*Of Innovations.*] It is a lovely poetical concept and likewise a comfortable and wholesome judicial concept that: "The thoughts of men are widen'd with the process of the suns."

(c) As said under subhead *a,* this paragraph, it is well to give heed to the precise questions necessarily involved and to exclude all others. For instance, we have not here a case of a railroad engaging in interstate commerce where the facts may show that an intrastate rate is bound to effect or may within reason affect an interstate rate, or where arbitrary corporate bookkeeping is kept on a plan involving shifts of credits and debits because of inter-relations and interdependence between those rates. Nor have we a case of a public utility where a service rate was established at the outset, or later, by valid contract or by valid charter provisions. Hence, what we have to say does not relate to any such case. They can take care of themselves when such questions are in judgment; for, as seen, the instant case is unembarrassed with complications of that character.

II. *Of other statutes and other sections in pari materia with said section 47.*

A correct perspective of the question in judgment cannot be had without reference to other statutes and

other sections of the Public Utilities Act in *pari materia* with section 47. Attend to that feature.

(a)   By the general statutes railroads are classified into classes *A, B, C,* and *D*. [R. S. 1909, sec. 3231.] Relator belongs to class *C,* that is, to railroads of a greater length than forty-five miles and not trunk lines, or leased, owned or controlled by a trunk line. By section 3232, *ibid.,* railroads in class C are limited to passenger rates not exceeding two cents per mile, and by the next section a violation of that provision is made a misdemeanor to be punished by a fine of not less than $100, or more than $500. By section 3240 freights are classified; and by the next section maximum freight rates for carload lots are prescribed; and by the next section the violation of the provision relating to such maximum freight rates is made a misdemeanor to be punished with a fine not exceeding $5000. By sections 3244 and 3246 rates are prescribed for the class to which relator belongs for carrying melons, apples, pears, strawberries, peaches and grapes and other berries in carload lots. The violations of the provisions of section 3246 are made misdemeanors and each offence is punishable by a fine not exceeding $1000. Other sections provide other regulations of rates and their violation are made misdemeanors. By section 3258 power was given to former boards (now defunct), that of Railroad Commissioners, or Railroad and Warehouse Commissioners, to classify freights, and by section 3251 to prescribe freight rates. By section 132 of the Public Utilities Act the duties and powers of the Board of Railroad Commissioners and the Board of Railroad and Warehouse Commissioners are to be exercised and performed by respondent in relation to things and corporations, etc., coming within the provisions of the act. Having expressly repealed certain sections of the general statutes, the act last mentioned has this repealing clause, to-wit (Sec. 139): ". . . and all other acts and parts of acts

in conflict with this act are hereby repealed. The provisions of this act are not intended to repeal any law now in force, unless in direct conflict therewith, but is intended to be supplemental to such laws.''

In addition to the foregoing and somewhat germane to the investigation of questions raised, is section 3179, Revised Statutes 1909, making railroads public highways and companies running and operating cars thereon common carriers. That section prescribes that charges for services in transporting of freight shall be reasonable and just, and all unreasonable and unjust charges are prohibited and declared unlawful.

And another, to-wit, section 3187, *Ibid,* requiring carriers to post for public inspection freight rates established by them not in excess of maximum rates now or hereafter established by law, interdicting an advance in rates except on notice, etc., permitting a reduction of rates of which notice shall be given, and precribing that it shall be unlawful to charge a larger rate than the established rate ''the same not being in excess of any statutory maximum rates now or that may be hereafter in force'' and it is made the duty of the Railroad Commissioners to see that such rates are reasonable and just, etc.

Such is a faint but sufficient bird's-eye view of the former statutory scheme relating to freight and passenger rates, and of the express provisions of the Utilities Act for clearing away obstacles and connecting up its scheme with what remains of the former one. It will be seen that by the former scheme the statute itself prescribes a fixed maximum passenger rate of two cents per mile for railroads of relator's class and interdicted a rate in excess of that and prescribed a like maximum freight rate for carload lots and a like interdiction. It gave the old boards (now defunct) regulatory power over at least some freight rates.

In this condition of things it was argued by relator's counsel in part (i. e., if we get the run of a highly

technical and ingenious argument) that those defunct boards, to which respondent succeeded, themselves had authority under the old system to vary maximum rates prescribed by statutes up as well as down. On such postulate, counsel conclude that the power denied by respondent to now exist is not a new or strange authority but comes to respondent by inheritance from the former system. Respondent's counsel argues *contra.* Such particular contention we think it would be unprofitable to decide. It is possible that by critically analyzing and comparing many intricate and expansive provisions of prior statutes the power to vary upward a prescribed statutory maximum freight rate might be pieced out or implied from detached phrases, sentences or provisions, but in doing so care would have to be taken not to torture those statutes by a too labored or refined construction, remembering the while the rule requiring all their provisions to be construed harmoniously when possible. In reason it is much more likely that it would be found that the broad trend of intendment in the old statutory scheme runs with respondent's contention. However, being persuaded that neither the one view nor the other is controlling in the determination of the instant case we put the question aside—especially as it does not touch passenger rates. Let it be reserved to be decided when, if ever, some case comes here breaking on it as decisive. The most favorable view for respondent is that relator must stand or fall on the proposition that the power to change upward a statutory maximum passenger or freight rate arises strictly on the construction of the new law, the Public Utilities Act, if at all. Respondent cannot complain if we let the case proceed on that theory. Whether relator can complain or not, the sequel will show. Accordingly let the case so proceed.

We now come to a matter of more emphasis, to-wit, a consideration of other sections of the Public Utilities Act *in pari materia* with section 47. There

is a rule of statutory construction to which we will recur presently making the intendment, the scope and philosophy of the lawmaker's scheme, as a symmetrical whole, of value in illuminating any particular provision of that scheme. The maximum is: that the best construction is that which arises on the whole instrument. Hence the words of section 47 must be construed in connection with other provisions of the act relating to the same subject-matter—this under a doctrine related to that of *noscitur a sociis*. Attend to a summary, rigidly condensed, but sufficient I think for our purposes, of related provisions of the Public Utilities Act.

(b) It elaborately laid its foundations broad and deep, beginning at the beginning and step by step with the pains and patience of evolution covers its grounds. Thus: in section 2 it defines the terms "railroad," "railroad corporation," "common carrier," "transportation of property," "transportation of persons," "public utility," "service," "rate"—all this for the purposes of finally and effectually dealing with the entities covered by those terms. On the theory it deals with business affairs of every day moment and demanding immediate correction by common-sense methods; it selects, free from whims of party politics and popular elections, and through the highest executive officer of the State, a commission; provides that commission with counsel learned in the law; gives it a swarm of drastic and flexible powers apparently on every conceivable angle of the subject-matter; provides it with a seal; makes it one of the great administrative departments of the State; strengthens it with powerful aids in engineers and experts, and, by appropriation acts, wisely puts at its disposal sufficient money to seek out the facts and make the act operative.

Section 16 prescribes that the "jurisdiction" of the commission, its supervision, powers and duties shall extend to all railroads and all transportation of

persons or property, to common carriers, and to all persons and corporations engaged in the transportation of property or freight and to public utility corporations. By other sections we see that its "decisions" are to be published for public information and use and are to be conclusive, unless modified, on rehearing or review; that it is given compulsory process, by other sections, for witnesses and papers; that its orders are to be obeyed under pains and penalties.

By section 27 it is ordained that common carriers shall furnish such service and facilities as shall be safe and adequate and their charges "shall be just and reasonable and not more than allowed by law or by the order or decision of the commission, made as authorized by this act." Moreover, charges for transportation of passengers or property "in excess of that allowed by law or by the order or decision of the commission" are prohibited.

By the next section switches and sidetrack connections are put within its jurisdiction.

By the next, printed tariff schedules are to be filed with the commission, and kept open to public inspection.

By section 31 schedule rates so filed may not be changed without the order of the commission.

By section 35 a common carrier may not engage in transportation of passengers or property without having filed such schedule of rates—this under pains and penalties.

By section 43 the commission is given the power to "examine" common carriers, railroads and railroad corporations and to keep informed as to their condition, capitalization, franchises and the manner in which their lines and property are managed and conducted with respect to adequacy, security and accommodation of service and their compliance with the provisions of law and the orders and decisions of the commission.

By section 44 they are compelled to report to the commission in a form and terms and at times and with specifications ordered by it.

By section 45 the commission is charged with the duty of investigating accidents, and the common carrier or corporation is obliged to give notice of such accidents to the commission.

By section 46 plenary power of investigation as to acts or omissions is given.

Then follows section 47 (part of which has been hereinbefore set forth). That section goes on with minute particularity to cover a large part of the field of railroad business, bringing it within the scope of the hearings and orders of the commission.

By section 48 it is given power to stay increased rates.

By section 49 it may order repairs or changes.

By section 50 it is given power to abolish or permit grade crossings.

By section 51 it has power to order changes in time schedules and require the running of additional cars and trains.

By section 52 it is given power to establish a system of accounts for railroads.

By section 53 a railroad may not be constructed except on the certificate of the commission that the present or future public convenience and necessity require such construction.

By sections 54, 55, 56, 58 and 59, the issue of stocks, bonds, and notes, the transfer of franchises or stocks, the sale of franchises or stocks, the approval of issues of stocks, bonds or other forms of indebtedness, an account of the disposition of stocks, bonds, etc., are all put within the control and supervision of the commission.

By section 60 the commission is given a power we greatly stress, to-wit, the power to ascertain the value of the property of every railroad corporation, and of

every fact which in its judgment may or does have a bearing on such value, and to make re-valuations. To that end it may cause a hearing to be held on giving thirty days' written notice at which the corporations to be affected may be heard. The evidence at such hearing is to be put in writing and certified under the seal of the commission and filed. Its findings on that head are subject to review in court. Among other things section 60 ordains as follows:

"The findings of the commission so made and filed, when properly certified under the seal of the commission, shall be admissible in evidence in any action, proceeding or hearing before the commission or any court in which the commission, the State or any officer, department or institution thereof, or any county, city, municipality or other body politic and the railroad corporation, street railroad corporation or common carrier affected may be interested, whether arising under the provisions of this act or otherwise, and such findings when so introduced shall be conclusive evidence of the acts therein stated as of the date therein stated under conditions then existing, and such facts can only be controverted by showing a subsequent change in conditions bearing upon the facts therein determined."

By section 61 power is given, on hearing, to require "depreciation" accounts in accordance with the rules and regulations prescribed by the commission and the corporation engaged in the transportation of freight or passengers is required to conform to the rates of depreciation fixed or determined by the commission and to set aside the moneys so provided for "out of earnings and carry the same in a depreciation fund and expend such fund only for such purpose and under such rules and regulations" as the commission may prescribe.

259 Mo.—46

By section 63 such public service corporations must obey every order or decision of the commission made under the authority of the act so long as the same remains in force; and every failure to obey, results in a forfeit to the State in a sum not less than $100 nor more than $5000, for each and every offense, and every violation of any such order is deemed a distinct offense and, in case of continued violation, every day's continuance is deemed a distinct offense and officers and agents procuring, aiding and abetting in such violation or failing to obey such orders are made guilty of a misdemeanor.

By other provisions a court review of the commission's findings is provided.

By section 108 any corporation, person or public utility is given the right to complain on the same grounds given to other parties.

By section 116 the commission is given power to require a public utility corporation to maintain and operate its line, plant, system, equipment, apparatus, tracks and premises so as to promote and safeguard the health and safety of its employees, passengers, customers and the public.

III.  *Of the demurrer.*

Section 47 of the Utilities Act is not so plain and certain as to need no borrowed and interpreting light from other sections of the act or from kindred elder statutes.  Hence the demurrer, to be well ruled, must keep all the premises in view.  We have come to the conclusion it does not lie and that a peremptory writ must go.  This, because:

(a) It is apparent from the outline of the Utilities Act given in paragraph two that it is a radical departure from the policy of former statutes.  We need not go into details; for the thing speaks for itself. Whatever may be the case in other particulars, it, subject

to constitutional provisions, occupies the entire field on given phases relating to rates and service. This becomes clear either from a study of the language of section 47 or by getting at the meaning of that section from the broad scope, the philosophy and intendment of the whole act.

(1) Take the latter proposition first. A court would expect to find in a rounded out Utilities Act, made by a just and intelligent lawmaker, as here, that such act approached the subject-matter of service and rates from several angles. It would expect to find that the act justified its existence by impliedly, at least, recognizing that the utility with the public is vitally interested in service and rates; next that controversies and frictions might exist (or would be expected to spring up on that score) detrimental to both; next that the statutory scheme theretofore existing, if any, not only for settlement of those controversies but for the protection of the owner of the utility as well as of the public in the matter of service and rates had become antiquated or inadequate. Such court would expect to find that the act runs on the theory that the corporation, in order to spend, must be allowed to gather — that (if we may be allowed a homely figure) the intake bunghole in the corporate barrel would be open simultaneously with the outgo spigot. Without being driven to it, *willy nilly*, no court would expect to find in such act the pestiferous idea crystallized into law that the solicitude of the lawmaker was *exhausted*, or stopped short, at prescribing a multitude of onerous duties and a multitude of substantial outlays for the corporation. *Contra*, it would expect to find a corresponding legislative solicitude in the line of providing the ways and means essential to carrying out the orders of the commission on safe and adequate service. Moreover, such court would expect to find evidence in such Utilities Act that the lawmaker knew a corporate money chest

did not replenish itself in some miraculous way, like the widow's cruse of oil, for instance; knew that funds for safe and adequate service must directly or indirectly, sooner or later, spring from freight rates and passenger fares. Otherwise the utility corporation would be headed by the act itself toward death through starvation—an absurd and unthinkable hypothesis.

In that view of it a court would naturally expect the lawmaker would provide a plan for a corporate income out of which it must eventually not only get returns on its investment but meet the outlays the act contemplated the commission might or would exact.

Now the act in question comes up to those judicial expectations. Recognizing that a negligently wasteful corporate life, a diseased or dishonest corporate life, or a slovenly lack of care in safety and adequacy of service are matters of public concern, are necessarily reflected in rates and income, and that regulation lies within the police power, the Legislature, as seen in paragraph two, charged the commission with the duty of supervision over corporate bookkeeping, stock issues, bond issues and creation of other indebtedness, sales of franchises as well as in matters of safety and adequacy in service. In fine it gave the commission plenary power to coerce a public utility corporation into a safe and adequate service and the performance of the public duty unto which its franchise bound it. On the other hand, the act does not contemplate a confiscation of corporate property, and we include in the term "property" the right to earn a reasonable return on its investment. Looking to that end, the act undertakes to balance outgo with income. It covers that field. It proceeds on common sense and scientific lines by providing a plan for the valuation of corporate property in section 60. We pause to ask: Was that to be "lost motion"—mummery? What was it for except to get at the ultimate fact of what would be a passenger fare and freight rate

yielding a "reasonable compensation"; or (to use the significant language of section 47), *"a reasonable average return upon the value of property actually used in the public service?"* What was it for except also to get at a rate sufficient to make an income out of which the corporation could carve a reservation "for surplus and contingencies" as provided in section 47? What could it be for except to get at such rate as would be sufficient to create an income from which the corporation could carve out a "depreciation account" to be used and expended under the eye of the commission as provided in section 61?

We take it that a decent respect for the Legislature precludes the theory that the commission was given control of expenditures and denied control of income, the two being inseparable in the very nature of things. Moreover, it precludes the theory that the commission was given power to ascertain a just rate and then (wonderful to relate) was denied power to enforce it—that prior legislation controlled the rate, while the commission controlled the outgo, thereby providing an upper and nether millstone with the corporation between. Therefore it follows that, if the hand of the Legislature by former acts was so laid on rates that no power existed to increase a hard-and-fast maximum general statutory rate. (established to cover all cases and arrived at by legislative guess, however intelligent the guess may be, as seems to be the case at the time the Utilities Act was passed), the conclusion is irresistible that the Legislature intended its hand should be lifted, and that by general rules and methods prescribed for the guidance of the commission, as here, it was intended that it first ascertain the facts and next should apply them in regulating rates, up or down.

(2) But taking a narrower view and one closer home, a careful analysis of section 47 leads us to the same conclusion. Certainly there are no words in that

section necessarily compelling an opposite conclusion, and though there is some unfortunate obscurity, yet all its language may be harmonized with the conclusion that the commission has that power.

(3) The view just announced is fortified by facts of current history of which we may take judicial cognizance, to-wit: At the time of the passage of the Utilities Act the statutory maximum freight and passenger rates in this State were challenged in the Federal courts as unconstitutional, because confiscatory. In aid of that litigation an ambitious attempt had been made to present to those courts the facts pro and con on that issue. In June, 1913, in the Supreme Court of the United States (*vide,* Missouri Rate Cases, 230 U. S. 474), an opinion was handed down sustaining those laws on the state of the proof presented by the record as to named railroad companies and ordering the bills (injunctions) dismissed as to them respectively without prejudice, but it was also held that our hard-and-fast statutory rates were confiscatory as to certain named companies. There had existed grave doubts in the well-informed public mind on the validity of those rates. It was feared that the facts would show them confiscatory in some instances or possibly in all. Moreover, it was recognized that a mere legislative opinion on what a just rate should be (with the chance of the facts upon which the opinion was based being found non-existent or untrue in part by the courts) was an uncertain and unscientific basis for a rate, although the right under the police power to prescribe rates is taken as a legislative right. The history of the times shows (and we have no call to pretend ignorance therein) that a scientific plan of valuation of railroad properties actually used in the public service had come to be deemed an essential element at getting at just compensation, thereby excluding fictitious or sentimental values, mere "wind and water," on one side, and including actualities on the other. Obviously

the utilities act sprang from the womb of such condi-
tions and a sensible judicial interpretation of that act
on broad lines ought not to ignore those conditions.
The demurrer, we think, does ignore them. To over-
rule the demurrer recognizes them.

(b) This opinion might close at this point, but it
may not be amiss to make some other observations
and announce some certain other propositions in point.
Thus:

(1) Respondent disavows power to repeal a stat-
ute or to declare a statute unconstitutional. That dis-
avowal is correct. The repeal of a statute is a legis-
lative act. To declare a statute unconstitutional is a
judicial act. In this State all judicial power is vested
in the courts. [Sec. 1, art. 6, Constitution.] And leg-
islative power is vested in the General Assembly. [Sec.
1, art. 4, Constitution.] So, respondent claims only
administrative powers. That claim is justified. But
neither those disavowals nor that claim settle the ques-
tion on demurrer.

(2) Section 47 of our Utilities Act is borrowed
from a statute of New York. It varies from that, but
the variations are not of substance on any question
involved here. In New York the original statute was
amended. We borrowed it with the amendments. As-
suming the rule to apply, namely, that when a statute
is borrowed by a sister state it is adopted not only in
verbiage but with the construction put upon that ver-
biage in the state of its origin (agreeable to which the
authorities run) yet we are not cited to any authori-
tative New York decision interpreting the statute as
amended. The statute was before New York courts
prior to amendment and so far as that court announced
doctrine, it does not run counter to the conclusions
reached in this opinion, nor do the amendments do so.
[People ex rel. v. Public Service Commission, 140 App.
Div. (N. Y.) 839.]

(3) In so far as elder statutes undertook to make hard-and-fast rates, charges that might be lowered but not raised so as to conform with "reasonable compensation," or "reasonable average return on the value of the property actually used in the public service" by the corporation, it must be held they were inconsistent and in conflict with the Utilities Act in those particulars and stand modified by the later act when the facts warrant, which later act, under canonized rules of construction, and as a younger act covering the field, must control. It is not necessary for us to hold that all statutory rate provisions were, *eo instante* and *ipso facto,* repealed. It is sufficient for us to hold and we do hold that the Legislature could delegate to the commission, as an administrative body, the power to ascertain facts warranting a readjustment of rates in accordance with general statutory rules announced by the lawmaker (as is the case here), and that when such rate was so ascertained the modification of rates contemplated by the statute might take effect under the orders of the commission despite the elder statutes. This leaves statutory maximum rates in force until facts established before the commission call into play the modifications contemplated by the Utilities Act. In no other way can the statute be given vigor and be made a complete and rounded scheme adjusting itself to meet the form and pressure of the facts in each particular case and subserving right ends. If the result reached aids a crippled and distressed public service corporation on the one hand in a given case, or a distressed and harrassed public on the other in another given case, then, in either event, justice is done. It cannot be expected that this court will take color from corporate prejudice, if such exists. It ought not to be expected that through fear of popular disfavor we would coyly toy with a situation. If there are nettles to be handled the right plan is to

State ex rel. v. Public Service Commission.

grasp them with a firm hand. The sting is less. We sit here, as we see it (and take leave to say so) to administer justice to individual and corporation, those in power and those out, the weak, the strong, the high, the low, indifferently, peradventure fearing none and fawning on none. The claim so made for ourselves we accord unstintingly to the Honorable Public Service Commission of the State of Missouri. To that end the commission should set aside their order dismissing the complaint, reinstate the proceedings, set a day and place for a hearing and proceed to take the proofs to the end that the matter may be disposed of as the facts warrant.

The curious may find other legal sources of our judgment in the authorities furnished in counsel's briefs and set forth in the headnotes of our reporter. The demurrer is overruled.

Let an absolute writ of mandamus go. All concur.