STATE ex rel. CITY OF ST. LOUIS, a Municipal Corporation, Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI ET AL.

STATE ex rel. PRIEST ET AL., Appellants, v. PUBLIC SERVICE COMMISSION OF MISSOURI ET AL.—56 S. W. (2d) 398.

Division Two, December 31, 1932.*

---

*NOTE: Opinion filed at April Term, 1932, September 28, 1932; motion for rehearing filed; motion overruled at October Term, December 31, 1932.

*Julius T. Muench* and *Forrest G. Ferris, Jr.*, for appellants.

1100

*D. D. McDonald* and *N. W. Simpson* for respondent.

1102

FITZSIMMONS, C.—City Utilities Company, a Delaware corporation, not licensed to do business in Missouri, made application to the Missouri Public Service Commission for an order granting the consent of the Commission to the applicant company to acquire and hold more than ten per cent of the total capital stock of St. Louis Public Service Company, a street railroad corporation, existing under Missouri law and operating as a public utility the street car lines in the city and county of St. Louis. The city of St. Louis, on its own behalf and Henry S. Priest on behalf of certain stockholders of St. Louis Public Service Company, intervened and opposed before the Commission the application of City Utilities Company. The Commission granted the application and · overruled the motions of interveners for a rehearing. Interveners then sued out of the Circuit Court of Cole County writs of *certiorari*, or of review as the statute also calls them. [Sec. 5234, R. S. 1929.] After consolidating the separate review causes of the interveners and after a hearing on the evidence introduced before the Commission and certified up by it, the circuit court entered judgment affirming the order of the Commission. From this judgment the interveners duly appealed. Interveners' motions for rehearing before the Commission "set forth specifically the ground or grounds," as Section 5233, Revised Statutes 1929, requires, on which they considered the order of the Commission "to be unlawful, unjust or unreasonable." The writs of review were "for the purpose of having the reasonableness or lawfulness of the original order of the Commission inquired into and

determined." [Sec. 5234, R. S. 1929.] The judgment of the trial court therefore in effect found that the order of the Commission was reasonable, just and lawful. The correctness of this judgment is for our decision. The questions raised are of first impression in the courts of Missouri.

For brevity, the applicant, City Utilities Company, sometimes will be called "Utilities Company" and St. Louis Public Service Company, "Public Service Company." The Utilities Company, in its application to the Commission described itself as "a corporation organized under the laws of the State of Delaware, authorized, among other things, to acquire and deal in stocks, bonds, and certificates of interest issued or created by other corporations, and to provide and render financial and other service and facilities to other corporations." Copies of its certificate of incorporation and amendments thereof were attached. Its charter is very broad. In the words of the deposition of Col. Albert T. Perkins, Vice-President of the Utilities Company, (and a director of Public Service Company): "I presume, under that charter, as usual with those Delaware charters, I could run a corner grocery store or a skating rink under it. It covers pretty nearly every range of human activity."

The application of Utilities Company further recited that, under the plan of reorganization of United Railways Company of St. Louis, predecessor of Public Service Company in the ownership and operation of the St. Louis street car lines, applicant, as the owner of securities of the United Railways, "became possessed of the right to receive its proportionate share of the capital stock of Public Service Company, and petitioner has acquired subscription receipts entitling it to receive other shares of stock of Public Service Company, all of which stock will in the aggregate exceed more than ten per cent of the total capital stock issued by that company." The securities which the applicant originally held were bonds of the St. Louis Transit Company, foreclosed in the receivership of the United Railways Company. In lieu of these bonds Utilities Company received under the reorganization plan 10,725 shares of preferred stock and 28,722 24/90 shares of common stock of the Public Service Company. As the acquisition of stock of a public utility company under a reorganization plan in exchange for securities already held does not require the consent of the Public Service Commission under the statute (Sec. 5177, R. S. 1929) the right of applicant to hold them is not directly involved. The questions presented concern the acquisition by the applicant of additional shares of St. Louis Public Service Company under subscription rights which the applicant purchased from other security holders of United Railways Company subject to the consent of the Public Service Commission. The amount of these additional share of the Public Service Company, as found by the Commission, is 120,265 shares of common, which is

more than ten per cent of the total capital stock of the Service Company independent of the shares already held by the Utilities Company. But in reaching a decision whether that part of the order of the Public Service Commission authorizing the Utilities Company to acquire 120,265 additional shares of common stock was reasonable, just and lawful, we shall take into account the fact that the company already holds in its own name on the books of the Public Service Company 10,725 shares of preferred stock Series A and 28,772 24/90 shares of common.

The authorized capital stock of St. Louis Public Service Company consists of 73,193 shares of preferred Series A, and 343,645 shares of common, all without nominal or par value. Utilities Company asked permission to hold 35,000 shares of the preferred stock Series A, and 170,000 shares of the common. As there was no evidence of any arrangements of Utilities Company to acquire any preferred stock of Public Service Company over and above the 10,725 shares received by it under the United Railways reorganization, the Public Service Commission limited its permission to hold only that amount of preferred. The Commission also restricted its order con- senting to the holding of common to 28,772 24/90 shares acquired under the reorganization plan and to 120,265 shares, contracted for, subject to the approval of the Commission, a total of 149,037 24/90 shares of common stock of St. Louis Public Service Company.

The number of common shares under contract of purchase, namely 120,265, is approximately 35 per cent of 343,645 shares, the total common stock of the Service Company. The number of shares of common, both owned by Utilities Company and under contract, namely 149,037 24/90 is 40 4/10 per cent of the total issue of com- mon. The number of shares of common and preferred owned by Utilities Company and of common under contract of purchase, namely 159,762 24/90 shares all told, is 38 3/10 per cent of the total capital stock, common and preferred, of the Service Company. The common stock is the voting stock.

The Utilities Company, in its application to the Commission, gave its own reasons to justify the order asked and obtained thus: "Accordingly, it is the purpose of Petitioner to acquire shares of the capital stock and other securities of Public Service Company, if the Commission consent thereto, and Petitioner is in position to, and will, extend from time to time, such financial and other aid to Pub- lic Service Company as may seem necessary and advisable; and such stock acquisition will, therefore, inure to the advantage of the public, in that Public Service Company will have the benefit of the financial resources of Petitioner and the aid of its competent official staff." The applicant also informed the Commission, for the purpose of dis- closing the extent of its interest in Missouri public utilities, that it had acquired a financial interest, without voting power, in the

Kansas City Public Service Company, which owns and operates the Kansas City street railway properties. The book value of the Kansas City holdings, as shown by the evidence was $1,113,517.80 and consisted of preferred stock and preferred stock receipts and common stock and common stock receipts. The book value of St. Louis Public Service Company stock preferred and common including the common for which the application was made was $3,893,923.65.

The statute under which Utilities Company made application and the Public Service Company gave its consent to the acquisition of more than ten per cent of the capital stock of the Public Service Company is Section 5177, Article 3, Chapter 33, Revised Statutes 1929. The pertinent parts of the statute are as follows: ''No railroad corporation, street railroad corporation, or electrical corporation, domestic or foreign, shall hereafter purchase or acquire, take or hold, any part of the capital stock of any railroad corporation or street railroad corporation or other common carrier organized or existing under or by virtue of the laws of this state, unless authorized so to do by the commission; and save where stock shall be transferred or held for the purpose of collateral security, no stock corporation of any description, domestic or foreign other than a railroad corporation, street railroad corporation, or electrical corporation, shall, without the consent of the commission, purchase or acquire, take or hold more than ten per centum of the total capital stock issued by any railroad corporation or street railroad corporation or other common carrier organized or existing under or by virtue of the laws of this state . . . Every contract, assignment, transfer or agreement for transfer of any stock by or through any person or corporation to any corporation, in violation of any provision of this chapter, shall be void and of no effect, and no such transfer or assignment shall be made upon the books of any such railroad corporation or street railroad corporation, or shall be recognized as effective for any purpose.''

The interveners properly preserved their objections, the principal grounds of which are: (1) That City Utilities Company, a foreign corporation, not licensed to do business in this State, has for one of its express corporate purposes the acquisition of the securities prayed for in its application; that it has acquired securities of the St. Louis Public Service Company, and by reason of or on account of the acquisition of these securities it has been doing business in St. Louis in violation of the statutes. (2) That the order of the Commission consenting to the acquisition by the Utilities Company of stock of the Public Service Company, coupled with the purpose of Utilities Company stated in its application and testified to by Col. Perkins, its Vice-President, to render financial and technical aid to the Public Service Company, is a sanction to an unlicensed foreign corporation

to do business in this State in violation of the statutes and in usurpation of the powers of the Secretary of State in respect to foreign corporations. (3) That applicant's ability to render financial aid to Public Service Company was not supported by the evidence. That it was admitted and the Commission in its findings held that "the local company (St. Louis Public Service Company) has a staff of well-trained expert and efficient officers and employees, fully capable of managing and operating the property, and that the applicant at the present time, has no operating personnel superior to that of the local company." Therefore that the reasons advanced by Utilities Company in support of its application failed. (4) That the Commission erred in its findings as to the public policy of Missouri concerning the acquisition by another corporation of more than ten per cent of the capital stock of a public utility corporation.

I. A loan of one million dollars by Utilities Company to St. Louis Public Service Company is one of the acts stressed by interveners as evidence that Utilities Company was doing business in St. Louis. The place of execution and delivery of the note evidencing the loan and the place of payment do not appear in the record. Minutes of a meeting of the Board of Directors of the Utilities Company held in New York City, December 30, 1927, recorded the application of the Service Company for the loan and the giving of authority to the officers of the Utilities Company to borrow from a New York bank on the note of the Utilities Company one million dollars to be loaned to the Service Company. When the note of the Public Service Company fell due six months later, the renewal contract, by the minutes of the Utilities Company, was made in New York. The evidence on the million dollar loan does not support the charge that Utilities Company was doing business in St. Louis, since the record of that company shows that it performed its part of the contract of loan in New York.

But the record contains other evidence bearing on the question whether, at the time of the hearing before the Commission, Utilities Company was and had been doing business in Missouri at St. Louis. Col. Albert T. Perkins, who gave his deposition and later testified before the Commission, was living at Clayton in St. Louis County, when his deposition was taken on January 18, 1928, and had been living there for seven or eight years. Col. Perkins had been manager for the receiver of the United Railways Company of St. Louis, at a salary of $25,000 per year, for eight and one-half years, until the receiver turned over the St. Louis street railways to the St. Louis Public Service Company on December 1, 1927. On that day Col. Perkins ceased to be a managing official of the St. Louis street railways and became a Vice-President of City Utilities Company, the

applicant here. He was not chosen a director of the latter company and he made it clear he was only an employee holding office at the pleasure of those above him. The Colonel as Vice-President of Utilities Company, was receiving at the time of the hearing, $25,000 per year, the same salary that the receiver of the United Railways Company had paid him.

Colonel Perkins performed in the city of St. Louis at least a large part of the services for which he was receiving $25,000 per year from Utilities Company. In his deposition, read before the Commission, Col. Perkins said: "As to the services which have already been rendered by applicant to the St. Louis Public Service Company: There have been two kinds of services: I, as a member of the City Utilities staff, have been very familiar with the affairs of the new St. Louis Public Service Company, having lived with its problems for the last eight and one-half years when its predecessor, United Railways Company, was in receivership, and have had a very long previous experience in similar affairs. I have been giving a great deal of time advising with and assisting the St. Louis Public Service Company's officers in enabling them to expedite the reorganization of their work. This has been in an advisory capacity to the operating company."

The second class of service rendered as testified by Col. Perkins, was the loan of one million dollars to which reference has been made.

At the time of giving his deposition, Col. Perkins was occupying an office in the premises of St. Louis Public Service Company. On this point he testified: "I have stated that there have been no charges made against the St. Louis Public Service Company for direct services; nor have there been any for indirect services of any nature. I am occupying a suite of rooms belonging to the operating company, but am paying full rent therefor and am also paying my proportion for telephone and other charges. My occupancy of a portion of the company's quarters is tentative, and is a matter of convenience to the reorganization committee. At the end of this month I shall secure other quarters." On the same point, Mr. Stanley Clarke, President of the St. Louis Public Service Company, testified: "I don't know what charges the holding company (applicant) expects to make. It is not making any charge against the St. Louis Public Service Company at present. The City Utilities Company, in addition is paying its own office rent, so no charge whatever is made by it against our company for service rendered."

From the foregoing it appears that, at the time of the hearing before the Commission, Utilities Company, a foreign corporation not licensed to do business in Missouri, was maintaining an office in St. Louis.

Concerning the intentions of Utilities Company, in case its application for the acquisition of stock of Public Service Company were

granted Col. Perkins testified: "As to the benefits or advantages to the St. Louis Public Service Company, in the event this application is granted: As we expect to develop our plans, they will be very advantageous, both to the operating company and to the city as well. The recent financial aid is an example of what will take place."

And again: "The City Utilities Company expects to develop a staff which will properly be equipped to furnish special services when they may be needed to protect the interests of the stockholders and to work on what I believe are matters of supreme importance, not only to stockholders in present urban transportation companies, but for the municipalities where they are operating, in the broader general study of urban transportation problems.

"I will again state that those services will not be forced upon the St. Louis Public Service Company unless specific request therefor is made by it. At the present time' the St. Louis Public Service Company and this applicant are independent as to operation. There is no connection between the two except as a stockholder, and at the present time this applicant is a small stockholder. While I am a director of the operating company, I am only one of thirteen."

And another time Col. Perkins testified: "The City Utilities Company is composed of about eighty individuals, practically all of whom, through this plan, are interested in the St. Louis Public Service Company as stockholders. They have put their St. Louis Public Service Company stock into our company, or propose to.

"I will be in control of the offices of our company in St. Louis, and I will select the employees for that office."

From the record facts it is clear that City Utilities Company was doing business in Missouri and was planning to do business in St. Louis more extensively if the Commission consented to its larger holdings of common stock of St. Louis Public Service Company. This course of conduct was, and its future course was designed to be in violation of the statutes forbidding unlicensed foreign corporations to do business in this State. [Secs. 4596, 4599, R. S. 1929; Flinn v. Gillen, 10 S. W. (2d) 923; Chicago Mill & Lumber Co. v. Sims, 197 Mo. 507, 95 S. W. 344; Parke-Davis & Co. v. Mullet, 245 Mo. 168, 149 S. W. 461; United Shoe Machinery Co. v. Ramlose, 210 Mo. 631, 109 S. W. 567; Tri-State Amusement Co. v. Forest Park Highlands Amusement Co., 192 Mo. 404, 90 S. W. 1020.] The strict and even stern attitude of this court in the enforcement of the penalties of the statutes last cited is reflected in the last mentioned case of Amusement Co. v. Amusement Co., 192 Mo. 404, 90 S. W. 1020, l. c. 1025 as follows:

"It is too clear to admit of cavil that if foreign corporations are allowed to come into this State and do business with its people, derive all the benefits of such business, and fail to comply with the requirements of the statutes unless they need the aid of the courts

to enforce the contracts against the citizens of the State, the door will be left wide open for them to do such business and never bear any of the burdens that domestic corporations have to bear, unless they need the aid of the courts, and that a construction of the statute which would enable foreign corporations to so do would not only fail to place such foreign corporations upon an equality with domestic corporations and enable them to avoid payment of the incorporating taxes and fees and thus defraud the State, but if the corporation broke the contract and the citizen sought to enforce it, the foreign corporation would not then comply with the laws of the State, and the citizen would have to go to the domicile of the foreign corporation in order to sue it. It was to prevent the happening of such a contingency that the statute in question was, principally, enacted. The statute prohibits foreign corporations from doing business in this State without first having complied with the law.''

As has been said, the statutory test of a Public Service Commission order is whether it is reasonable and lawful. And to aid that test, Section 5232, Revised Statutes 1929, provides among other things: ''Whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall state conclusions of the commission, together with its decision, order or requirement in the premises.'' In the instant case, the Commission made an elaborate report covering twenty-two pages of the printed record. It ruled against the interveners the objection that Utilities Company is a foreign corporation not licensed to do business in this State. Its conclusion on this point was: ''The applicant is a holding company, its only business being that of holding stock of operating companies and of giving them managerial and financial aid, the operating company being the one that is doing business in this State and necessarily licensed by the Secretary of State for that purpose.'' In answer to this, it is sufficient to say that the cited statutes relating to foreign corporations make no distinction between holding and operating companies. They impose their commands, pains and penalties upon ''every corporation for pecuniary profit,'' and ''every company incorporated for the purpose of gain under the laws of any other state, territory or country now or hereafter doing business in this State.'' [Secs. 4596, 4597 and 4598, R. S. 1929.] The order of the Commission was made for the reason that the applicant Company was doing business in Missouri and planned to extend its business here in violation of the laws and the public policy of this State relating to foreign corporations. Therefore the order was unlawful and against public policy.

II. What we have said should not be taken to mean that only foreign corporations licensed to do business in this State may obtain the consent of the Public Service Commission to acquire and

hold more than ten per cent of the capital stock of a Missouri public utility company. The statute (Sec. 5177, R. S. 1929) says that "no stock corporation . . . domestic or foreign, . . . shall, without the consent of the commission, purchase or acquire" etc. It does not restrict the consent to licensed foreign corporations. It is conceivable that an unlicensed foreign corporation might in a given case obtain the consent of the commission to acquire stock in a Missouri utility company upon grounds that would be reasonable and not violative of any of our laws. This is not one of those cases.

▪▪ III. We come now to the questions of public policy raised by the interveners. The conclusions of the Commission as stated in its report are as follows:

"Summarizing the foregoing and our findings in connection therewith, it is our opinion that the public policy of the State of Missouri does not oppose the acquisition by another corporation of more than ten per cent of the capital stock of a public utility corporation; that an affirmative finding that the public will be benefited is not necessarily a condition precedent to the granting of such an application; that in this case no detriment or injury to the public by reason of the transfer of stock as is here proposed, has been shown; and that the prayer of the applicant should be granted."

The sources of evidence of what the policy of this State as to foreign companies is, are these: The Constitution and enacted laws of the State, the decisions of its courts of review, the practice of the executive departments and, presumably, the purpose to preserve *bonos mores* by keeping out everything tending toward fraud. [State ex rel. Standard Tank Car Company v. Sullivan, Secretary of State, etc., 282 Mo. 261, 221 S. W. 728.] Measured by this rule, the Commission was in error in holding that the public policy of Missouri does not oppose the acquisition by another corporation (particularly an unlicensed foreign corporation) of more than ten per cent of the capital stock of a public utility company. The section under which the consent of the Missouri Commission was asked and granted (Sec. 5177, R. S. 1929) gives strong expression to a public policy by providing that "no . . . corporation of any description, domestic or foreign . . . shall, without the consent of the commission, purchase or acquire, take or hold, more than ten per centum of the total capital stock issued by any railroad corporation or street railroad corporation or other common carrier organized or existing under or by virtue of laws of this State," and by declaring any transfer of stock stock in violation of the statute to be void and of no effect. That statute as a matter of public policy absolutely prohibits such ownership, subject to the exceptions that the Commission, by its consent, may set aside the prohibition. And, as we have seen, that consent, like all orders

of the Commission, must be upon grounds reasonable, just and lawful. Other sections of Article III, Chapter 33, relating to the powers of the Commission in respect to common carriers, railroads and street railroads give added proof of the policy of "regulation by negation," as one of our opinions phrases it. For instance, Section 5175, Revised Statutes 1929, provides that "The power of railroad corporations, street railroad corporations and common carriers to issue stocks, and bonds, notes and other evidences of indebtedness and to create liens upon their property situated in this State is a special privilege, the right of supervision, regulation, restriction, and control of which is and shall continue to be vested in the State, and such power shall be exercised as provided by law and under such rules and regulations as the commission may prescribe." And Section 5176, Revised Statutes 1929 prohibits any railroad or street railroad corporation or common carrier from selling, leasing, assigning or otherwise disposing of or encumbering the whole or any part of its property "necessary or useful in the performance of its duties to the public," or of merging or consolidating with any other company without the consent of the Commission. And Section 5178, Revised Statutes 1929, provides that such companies can only put out issues of stocks, bonds and other form of indebtedness with the approval of the Commission. Finally Section 5184, Revised Statutes 1929, imposes fines and forfeitures on any railroad or street railroad company or any common carrier violating any of the provisions of the Public Service Commission Act (including of course, the sections relating to unauthorized issues or transfers of stock) and declares guilty of a misdemeanor any officer or agent of such corporation who is guilty of a like violation. Like prohibitive sections are to be found in Article IV, Chapter 33, Revised Statutes 1929, defining the powers of regulation by the Commission of gas, electrical and water companies, and in Article V, Chapter 33, regulating telegraph and telephone companies. If the public policy of Missouri does not oppose the acquisition by another corporation of more than ten per cent of the capital stock of a public utility company, the mentioned statutes are without meaning or serious purpose and the consent of the Commission is an idle form.

IV. The statement of the Commission that an affirmative finding that the public will be benefited is not a condition precedent warrants the inference that the Commission did not receive any substantial proof of a public benefit. Utilities Company, in its application, stated that it was in a position to and would extend, from time to time, to Public Service Company such financial and other aid as might seem necessary and advisable and therefore that the stock acquisition would inure to the advantage of the public. Obviously the Commission did not find in the record before it any public advantage.

If it had, it would not have adopted the theory that no public disadvantage had been shown and therefore that the order should be granted. A further passing observation is that the Commission did not even find that there would be no detriment or injury to the public by reason of the stock transfer. It merely concluded that no public detriment or injury had been shown. In other words it cast upon the interveners a burden and a kind of proof that was not rightfully theirs.

But these comments are of lesser moment. We will give to the statements of the Commission full value and their true intent. The meaning and effect of the conclusions of the Commission now under examination are that the public policy of Missouri does not fix a public benefit as a condition precedent to the grant of the order made in this case, and therefore that a finding of no public detriment or injury likely to arise out of the order is legally sufficient to sustain the order. We disagree with this view and, for our reasons, we turn again to the sources of evidence of public policy, namely the Constitution, statutes and decisions. Section 5251, Revised Statutes 1929, declares among other things that the provisions of the Public Service Commission law "shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities." This court en banc in the case of State ex inf. Barker, Attorney-General ex rel. Kansas City, v. Kansas City Gas Co., 254 Mo. 515, 163 S. W. 854, l. c. 858, found in this and other sections the text for the lesson: "The act, then, is a highly remedial one filling a manifest want, is worthy a hopeful future, and on well-settled legal principles is to be liberally construed to further its life and purpose by advancing the benefits in view and retarding the mischiefs struck at—all *pro bono publico.*" And Section 5127, Revised Statutes 1929, imposes upon the general counsel of the Commission a specific duty to the public (and therefore with respect to the public welfare) in these terms: "In addition to the foregoing duties, it is hereby expressly made the duty of the general counsel to represent the public in all rate hearings before the commission at its office, and he shall, upon request, give to the public and any municipality advice and opinions as to their rights under the public service commission act and the legal methods and procedure for obtaining same." And since the plenary supervision of the Commission over every business feature of public utilities is "finally (however invisibly) reflected in rates and quality of service," (State ex inf. Barker ex rel. Kansas City v. Kansas City Gas Company, supra), it is a fair inference that the express statutory duty of the general counsel to represent the public in rate cases is also his duty in all other classes of cases. We indulge the presumption, of course, that the general counsel, in defending upon this appeal the findings and order of the Commission, was actuated by a sense of this duty to the public, how-

ever much the court in its opinion may depart from his point of view of the legal issues raised. █ The term "public welfare" used in the quoted statute, stating the rule of construction of the public service commission act, is a comprehensive expression, and embraces the health, peace, morals and safety of the community; that which is a public necessity or for the convenience of the public. [50 C. J. 867.]

█ Looked at from another angle, the Public Service Commission Act has been traced by this court to the police power of the State. [The Kansas City Gas Company case, supra; State ex rel. Missouri Southern Railroad Co. v. Public Service Commission, 259 Mo. 704, 168 S. W. 1156; State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201, 204 S. W. 497.] The police power is one of the sovereign powers and its proper exercise is defined by Article XII, Section 5, of the Missouri Constitution thus: "The exercise of the police power of the State shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the State." This court, in the case of Tranbarger v. Chicago & Alton Railroad Co., 250 Mo. 46, 156 S. W. 694, 1. c. 696, exalting the police power, held that it was one of which the state could not strip itself. "The only restriction upon the exercise of the faculty," said this court in its opinion, supra, "are that its use shall be reasonably adapted to the ends for which it is given, and that it shall not infringe any right or privilege guaranteed by the Federal Constitution." And the Supreme Court of the United States to which the Tranbarger case was taken by writ of error (Chicago & Alton Railroad Co. v. Tranbarger, 238 U. S. 67, 1. c. 761, 35 Sup. Ct. 678 1. c. 682, 59 L. Ed. 1204) built more firmly and deeply the foundations of the police power in this state in these words: "It is established by repeated decisions of this court that neither of these provisions of the Federal Constitution has the effect of overriding the power of the state to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. [Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 558, 34 Sup. Ct. 364, 58 L. Ed. 721, and cases cited.] And it is also settled that the police power embraces regulations designed to promote *the public convenience or the general welfare and prosperity,* as well as those in the interest of the public health, morals, or safety." █ Every order of the Public Service Commission is an exercise of that sovereign and unyielding police power. Most of the orders of the Commission regulate the conduct of business of public service corporations. And these orders, to be constitutional, must not permit the corporations to infringe the equal rights of individuals or the general well-being of the State. Even in those cases in which this court has

sustained increases in the rates of public utilities, and the power of the Public Service Commission to fix those rates above the limitations of contractual franchises, and has upheld the corporations in other contentions affecting their properties, securities, stock issues and their service to the public, the Commission and this court acted "with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities" as the statute provides. [Sec. 5251, R. S. 1929.] These principles being applicable to Missouri public utility companies, which are subject to the plenary control of the Public Service Commission, they should apply with added force to a foreign corporation not licensed to do business in this State.

The rule of no apparent detriment or injury to follow does not govern the conduct of persons or corporations in their affairs of moment. Prospective good and apparent benefits guide their steps. With far more reason public officers should use the same guide in affairs of state and for the general welfare. Hamlet, in his soliloquy, meditating suicide, but with "the dread of something after death," decides to "rather bear those ills we have than fly to others that we know not of." The case of Kansas City Southern Ry. Co. v. Chicago Great Western Railroad Co. et al., 58 Fed. (2d) 810, decided by the United States District Court for the Western District of Missouri since the instant case was argued, was based upon the section of our statutes which we have examined. [Sec. 5177, R. S. 1929.] That case reveals some symptoms of the ills which may affect controlled corporations and even the state when its Public Service Commission deals with a foreign corporation about stock ownership.

V. The briefs and the record devote much space to the ability of Utilities Company to give financial and technical aid to the Public Service Company. Those matters go to the reasonableness of the order. But if the order is unlawful, as it is in our opinion, the reasons for it are of no moment.

VI. Upon the grounds stated, we rule that the order of the Public Service Commission in this case was unlawful. The judgment of the circuit court is accordingly reversed and the cause is remanded with directions to the circuit court to enter a new judgment setting aside and annulling the order of the Public Service Commission. *Cooley, C.,* concurs; *Westhues, C.,* not sitting.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.