THE STATE ex rel. CITY OF ST. LOUIS, Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI, and T. J. BROWN et al., Members Constituting Public Service Commission of Missouri.—296 S. W. 790.

Court en Banc, July 11, 1927.

**1. PUBLIC SERVICE COMMISSION: Test Order.** An order of the Public Service Commission, approving the schedule of increased rates filed by a telephone company, putting them in force for thirteen months, retaining jurisdiction to continue or modify them upon further investigation and accurate reports, and declaring that in the absence of a further order the prior rates supplanted by the order shall be restored at the end of said thirteen months and thereafter continued in force, is a test order, or a preliminary order to ascertain exact facts upon which a final order fixing permanent rates can be made.

**2. ———: ———: Reasonableness.** Even a test-rate order fixing the rates to be charged by a public utility may be so unreasonable as to justify interference by the courts; but test orders are not viewed in the light of final orders, and the reasonableness of the rates prescribed by them is not scrutinized as closely as is the reasonableness of a final rate order. The reason is that to deny to the Public Service Commission the right to test out rates, by a preliminary order fixing rates for a limited time, would be to destroy the safest method it has for finding out what rate will be fair as between the public and the public service corporation.

**3. ———: ———: Appeal by City.** By express statute, the city in which is located the public utility, having properly been made a party as an intervener in the proceeding in the circuit court to review a test order fixing telephone rates made by the Public Service Commission, is entitled to an

appeal from a judgment approving the test order. The city is an interested party, not only as a user of telephones, but also as a municipal corporation on behalf of its citizens.

**4. APPEAL: Dismissal: Failure to Comply with Rules: No Statement.** In an appeal by the city from a judgment of the circuit court approving on review a test order of the Public Service Commission fixing telephone rates in the city for a period of thirteen months, where the only question involved is the reasonableness of those rates for that period, a failure by the appellant to comply with Rule 15 of this court, in that its brief contains no statement of the facts tending to show the unreasonableness of the rates, does not state what evidence was considered by the Commission as the basis of its order and does not even state what the evidence tended to show, requires that the appeal be dismissed; and particularly will an appeal be dismissed for a flagrant violation of Rule 15 where it is apparent that a dismissal will work no injustice to appellant.

Corpus Juris-Cyc. References: **Appeal and Error**, 3 C. J., Section 1584, p. 1409, n. 25. **Telegraphs and Telephones**, 37 Cyc., p. 1630, n. 77.

Appeal from Circuit Court of City of St. Louis.—*Hon. Franklin Miller*, Judge.

DISMISSED.

*Julius T. Muench* and *Forrest G. Ferris, Jr.*, for appellant.

Respondent complains that appellant's brief filed in this case on the merits violates Rule 15 of this court "in that it does not contain a fair and concise statement of the facts of the case." In addition to the statement proper, we set forth the specific grounds of error relied upon, and then follow the points and authorities. The brief concludes with the argument, wherein the facts are fully discussed and the law applied. We do not understand, especially in a case like this, that it is necessary or even good practice to set out in the statement proper, and comment upon, the evidence of the various witnesses, any more than it would be necessary or proper to repeat the assignment of errors. If this were done in this case, the statement proper would practically constitute the entire brief, and, in a large measure, dispense with the abstract. The statement proper sets forth, among other things, the parties involved, enumerates the hearings, gives a brief history of the proceeding, points out the prayer of the company, states that the Commission valued the Company's property at $24,700,000; that it granted increased rates in St. Louis, for business service only, of approximately $900,000 per annum; that in so doing, it necessarily had to determine the St. Louis value, revenues and expenses separately and apart from the other portions of the system. The statement concludes: "The city, in its assign-

ment of errors herein, challenges in several respects the value so found and the increased rates allowed, in the Commission's order of June 6, 1925.'' In other words, appellant here, in the statement proper, has attempted to state, briefly and without repetition, that this is a valuation and rate case. The particular instances wherein the Commission erred as to value, revenue and expenses, and the granting of increased rates, are specifically set forth in the assignment of errors next following. Appellant then sets out separately the points of law and the authorities relied upon, and this is followed by the argument, wherein the evidence is discussed and referred to under the points made, and the law applicable thereto is cited. Appellant has served upon respondent and filed in this court a so-called ''Statement, Brief and Argument of Appellant.'' Said brief is not in compliance with Rule 15 of this court, in that it does not contain a fair and concise statement of the facts of the case. The so-called statement contains neither a fair nor concise statement, or any statement whatever, of the facts in the case, either with or without reiteration. The appeal should therefore be dismissed. Longan v. Kansas City Rys. Co., 253 S. W. 758; Royal v. Ry. Co., 190 S. W. 573; State v. Hunt, 270 S. W. 368; State v. Parrish, 270 S. W. 689.

GRAVES, J.—The brief for appellant in this case is filled with a mass of irrelevant matter. Matters are briefed that have no place other than in a general treatise upon public service commission law. Counsel seem to have overlooked the real character of the order made by our Public Service Commission, which order was affirmed by the Circuit Court of the City of St. Louis. It is a test order, and nothing more. There has been no final order fixing rates for the telephone exchange of the Southwestern Bell Telephone Company in the city of St. Louis. The order made by the Public Service Commission reads:

''ORDER.

''This cause being at issue upon application and answer filed herein, and having been duly heard and submitted by the parties, and such investigation of matters and things involved having been had, and the Commission on the date hereof having filed its report containing its findings of fact and conclusions thereon, which said report is made a part hereof:

''Now, upon the evidence in this case, and after due deliberation, it is

''Ordered: 1. That the Commission finds that the Southwestern Bell Telephone Company's proposed schedule of rates in its St. Louis

exchange are just and reasonable and should be permitted to become effective, beginning July 1, 1925, for a trial period of thirteen months.

"Ordered: 2. That any and all increases of telephone rates provided for in said schedule referred to and authorized herein shall, at the end of said thirteen months' period, cease and expire, without further notice or order; and the rates and charges of said Southwestern Bell Telephone Company for furnishing telephone service in said St. Louis exchange shall then be reduced and restored by said company to the rates now on file and charged by it for such service: Provided, however, that the Commission may hereafter by further order continue in effect such increases in rates and charges for another and further period, or otherwise charge or modify such rates and charges.

"Ordered: 3. That said Southwestern Bell Telephone Company be required to keep full and accurate account of the revenues and expenses of operating its exchange at St. Louis, and file a full and complete report thereof with this Commission, on or before July 31, 1926, for the year ended June 30, 1926; that said report shall be in addition to any other reports now required by law; and that the Commission fully retains jurisdiction of the parties and subject-matter of this case to continue, charge or modify the rates for telephone service charged by said company in its St. Louis exchange, upon the expiration of said thirteen months' period, or at any other time upon the evidence as said Southwestern Bell Telephone Company or any interested parties may offer.

"Order: 4. That this order takes effect on the 18th day of June, 1925, and that the secretary of the Commission forthwith serve copy of this report and order on the parties interested herein, and that said parties be required to notify the Commission, on or before the effective date of this order, in the manner required by Section 25 of the Public Service Commission Law, whether the terms of this order are accepted and will be obeyed.

"By the Commission.

"(Seal)                          J. P. PAINTER, Secretary."

It will be noted that this is a mere test order, and nothing more. It is a preliminary order to ascertain exact facts upon which a final rate order can be made that will do exact justice between the public utility and the public. The reasonableness of test-rate orders cannot be scrutinized as closely as are final orders.

There are a number of questions raised and for determination before we get to the merits of the case, if we get there at all. But even for this purpose a general outline of the case must be made, and we are sorry to say that it must be made by the court rather than the appellant upon whom the duty is imposed by rule of this court. The preliminary questions are two in number. First, the respondents,

in motions to dismiss, challenge the sufficiency of appellant's statement of the case. They say there is no statement within the meaning of our rules. Secondly, each of the respondents has in said motions to dismiss the appeal, assigned several other reasons therein stated. These reasons can be noted in the disposition of the motions, so far as may be necessary under the views we have for the disposition of the case.

In this case appellant has a printed record of 695 pages, exclusive of seven pages of index. Going to the index we find the Southwestern Bell Telephone Company (the applicant for increased rates on business telephones only in the St. Louis exchange) introduced fourteen witnesses and a mass of exhibits in evidence. The Public Service Commission introduced one witness. The city of St. Louis (Intervener) recalled one of the company's witnesses, and introduced one of its own—an engineer. Besides the order, which we have set out, supra, the Public Service Commission made a report on all this evidence and its conclusions therefrom. On this report the order we have quoted is based. The report shows that the Commission had previously considered the properties of both the Kinloch and Bell Companies. It shows from evidence before it, that in cases of merger of two telephone systems there had to be an increase in rates, for a time at least. With all this record evidence, and the Commission's findings of the fact as to values and other matters, we find that appellant makes a statement within less than two printed pages. Here is the statement:

### "STATEMENT.

"This is an appeal by the city of St. Louis from the judgment, order and decree of Honorable Franklin Miller, Judge of the Circuit Court of the City of St. Louis, affirming, upon *certiorari*, the findings and order of the Public Service Commission of Missouri of June 6, 1925, wherein the fair present value of the property of the Southwestern Bell Telephone Company was established as $24,700,-000, and an increase in business rates only, approximating $900,000 annually, was granted for a period of thirteen months from July 1, 1925.

"The Commission, in 1922, authorized the consolidation of the Bell and Kinloch properties in the St. Louis exchange area, but denied the application of the company for certain increased rates at that time, pending actual unification of the properties. This order was accepted both by the company and the city of St. Louis, which had been made a party intervener by formal order of the Commission. The consolidation was actually effected and unified service given about August 3, 1924.

"Thereafter, on November 15, 1924, the company filed its Supplemental Application in the same cause (No. 3270), alleging in substance that the then present rates were not sufficient to earn a fair and reasonable return upon the then fair value of its consolidated property, and asked that its business rates be increased about $900,000 per annum.

"The city was again made a party intervener and entered its answer and protest to the granting of the relief as prayed.

"Hearings were held at various dates from December 11, 1924, to May 21, 1925, both at St. Louis and Jefferson City, and on June 6, 1925, the Commission made and entered its order establishing the value and fixing the rates.

"The Commission's order of June 6, 1925, was affirmed by the Circuit Court of the City of St. Louis on December 7, 1925, on *certiorari* sued out by the city of St. Louis.

"The increased rates granted apply to the St. Louis local exchange area. The Commission, therefore, was required, and did attempt, to exclude from consideration the value, revenues and expenses pertaining both to intrastate and interstate toll service, and find only as to the value, revenues and expenses of the St. Louis exchange.

"The city, in its Assignment of Errors herein, challenged in several respects the value so found, and the increased rates allowed, in the Commission's order of June 6, 1925."

Counsel for the Public Service Commission thus states his case:

"On December 2, 1913, the Southwestern Telegraph & Telephone Company filed schedule of increased rates to become effective January 1, 1914. After an exhaustive hearing the Commission decided, June 19, 1915, among other things, that the value of the property used and useful in the St. Louis exchange of the Southwestern Telegraph & Telephone Company was, as of December 31, 1913, $8,500,000, and approved the rate schedule of the company (8 Mo. P. S. C. 433, l. c. 464).

"The Commission later had up the question of the value of all the property of the above telephone company, known as the Southwestern Bell Telephone Company, in what is known as the State-Wide case. This case was appealed to the Supreme Court of the United States and that court found the value of the property used and useful in Missouri to be more than $25,000,000, and that one-half of said value was in the St. Louis exchange. [State of Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, 262 U. S. 276.]

"This same question of valuation was before the Commission again in 1920 and 1921.

## "PRESENT CASE.

"In March, 1922, a joint application was filed by the Kinloch Telephone Company and its subsidiaries and the Southwestern Bell Telephone Company asking the Commission to approve the purchase by the Southwestern Bell Telephone Company of the property and assets of the Kinloch Company and the merging of the two properties so as to render unified service in St. Louis.

"In the hearing following the filing of this petition, the city of St. Louis was present and represented by council. After the hearing, the Commission, on May 19, 1922, approved and authorized the consolidation by purchase and sale of the above properties.

"It might be well here to note that the original petition contained this averment: 'That the net increase in operating cost due entirely to the consolidation of the two properties cannot be made by adjustment of the Kinloch rates to the present authorized Bell rates. In order to provide an increase in revenue equal to or approximating an increase in operating cost, it will be necessary to make certain increases and adjustments in the present authorized rates for business exchange service and that these necessary rate changes are shown on Exhibit H, attached hereto and made a part hereof.'

"The Commission in its order granted the consolidation above referred to, ordered that: 'Until the actual physical merger and consolidation of the plants of such companies be affected so as to give unified service, the purchasing company may operate the separate exchange at such existing rates as are now on file with the office of this Commission. . . . Nothing contained in this order shall be construed as in any way affecting the duty or waiving the power of this Commission at any time hereafter to fix just and reasonable rates under and pursuant to the Public Service Commission Act of the State of Missouri.'

"On November 15, 1924, the Southwestern Bell Telephone Company filed a supplemental petition asking approval of a new rate schedule, which schedule was made a part of the supplemental petition, and in support of this application and schedule offered in evidence the following, which is a brief resume of the facts pertinent to the issues there raised:

### "'Revenue And Expenses.

"'Mr. Albert E. Scott, statistician of the Southwestern Bell Telephone Company, with twelve years of experience with the Bell Telephone Company, identified and testified to the correctness of the Exhibits 10, 11, 12, 13, 14 and others.

"'Exhibit No. 10 shows balance net income for depreciation and return for September, 1924, as $153,886, or an annual basis of $1,846,632.84.

" 'Exhibit No. 11 shows balance net income for depreciation and return for September and October, 1924, as $310,679.98, or an annual basis of $1,864,079.88.

" 'Mr. H. W. Ross, accountant for the Public Service Commission, whose qualifications were conceded, identified and testified to the correctness of Commission's Exhibit No. 1, which, on page 6 of said exhibit, shows balance net income for depreciation and return for the months of September, October and November, 1924, of $540,219.08, or on an annual basis of $2,166,876.32.

" 'This comprises all the testimony as to the actual revenue and expenses of the company since consolidation.

" 'Valuation.

" 'Mr. E. T. Manhood, valuation engineer for Southwestern Bell Telephone Company, who had experience in telephone business starting in St. Louis over twenty years ago, testified as to the value of the St. Louis plant, that the Supreme Court of the Unitel States, speaking of the entire property in Missouri, as it stood as of June 30, 1919, said that "the valuation should be at least $25,000,000.00," and again: "Starting with the value of the property in the State in 1919, the St. Louis portion of that is about 49.63 per cent; that is obtained by taking the relation of the value fixed by the Commission in St. Louis of $10,000,000 and some, and that by the Commission's value of our property in entire State. In other words, at the same time, the Commission valued St. Louis at $10,000,000 plus, they valued all of our property at $20,000,000 plus. Now, the relation of those two figures is 49.63 per cent. Now, applying that to the $25,000,000 value gives $12,407,500 for St. Louis."

" 'Then adding to that the net additions for plant by construction from that date, that July 1, 1919, to September 30, 1924, in amount of $7,853,000, which I believe Mr. Scott had on one of his exhibits, adding also the purchase price of the Kinloch properties $5,186,000, then adding the net addition in general equipment, which are not included in items 5 and 6, in amount of $194,000, then adding the addition to the working capital in amount of $944,000, then adding going value on the same basis as the Commission allowed it in the 1919 case, namely, ten per cent, by applying that ten per cent only to the additional plant that has been built since that value was fixed, would give an added going value of $1,417,000.

" 'Now, summing up that whole thing, that is, starting with the property as it existed in June, 1919, and adding the additions in cost, we get for St. Louis a value of $28,000,000.

" 'And again this witness testifies: "I had three computations as to what it would cost to reproduce this physical property new. The first one, on Exhibit 16, was $30,834,000. The second one, on Ex-

hibit 17, was $30,356,000, and the third one, on Exhibit 17, was $30,187,000. Those three checks or tests have led me to this conclusion: that an inventory and appraisal of this property would show the cost of reproduction, or 1924 cost, something in excess of $30,000,-000. This was physical property only.''

'' 'Mr. Ross shows in Commission's Exhibit No. 1, at page 4, total investment in plant for St. Louis Exchange property to January 1, 1925, is $23,286,070; investment in material and supplies on December 31, 1924, allocatable to St. Louis exchange, $179,951, making total of physical property $24,452,057. This would be without going value, or cash working capital.

'' 'Mr. Manhood's Exhibit No. 15, using Supreme Court valuation in State-Wide case as foundation valuation, $28,033,527 as of September 30, 1924. Mr. Manhood's Exhibit No. 16, estimate of reproduction cost new of the physical property used and useful in St. Louis exchange as of date September 30, 1924, found $30,834,200. Exhibit 18, total estimated value of the reproduction cost new and the book cost of the company, $31,470,000.

'' 'Mr. Smith, consulting engineer for the city of St. Louis, at the May 21, 1925, hearing, testified relative to the value of the property in question after considering this property from a number of angles, and made this conclusion as to that property known as the Kinloch part of the St. Louis Exchange: ''Now giving consideration to all above original cost, appraisal and depreciation by the Commission's engineers, considering present day prices as well as original costs, the relative value of the St. Louis exchange (the Kinloch part) would appear to have been about $4,000,000 when merged with the Bell; that is, exclusive of the Kinloch building, which I shall treat separately.''

'' 'Mr. Smith further reduced the above value by deducting forty percent from the property because ''about forty per cent of the Kinloch subscribers were lost in the merger.'' On cross-examination he admitted: ''Q. Mr. Smith, are you sufficiently familiar with the telephone business to know about what per cent of a telephone plant is represented by the telephones? A. I would say perhaps ten per cent. Q. Would it astound you to find that it was not five per cent? A. No, it wouldn't; I would think it would not be more than ten per cent, likely less than ten per cent.''

'' 'Relative to the Kinloch building, Mr. Smith states: ''The present value of that building, in my opinion, would appear to be not more that $900,000.'' Relative to the St. Louis exchange of the Bell property without the Kinloch property, Mr. Smith finds: Original cost, Dec. 31, 1913, $8,183,249; net additions, Dec. 31, 1913, to Mar. 31, 1917, $742, 940; net additions, Mar. 31, 1917, to Dec. 31, 1924, $9,098,602, ''making a total of $18,006,791 for cost new. De-

ducting 22.05 per cent for depreciation on the basis as I have just testified, making a deduction of $4,051,000, leaving net original cost, less reserve for depreciation, of $13,956,000; using last cost figure to bring up to 1924 level (1913 to 1924) brings up the corresponding figures for cost new and depreciative value to cost new $23,540,000; depreciative value, $18,240,000.''

### '' 'Going Value.

'' 'Mr. Manhood, valuation engineer for the Southwestern Bell Telephone Company, testified to a value of $4,500,000 as the going value of the St. Louis exchange, basing this on fifteen per cent of the physical property. Mr. Smith, consulting engineer for the city, used fifteen per cent as the proper amount for materials and supplies, working capital and going value.

### '' 'Rate of Return.

'' 'Mr. Breckenridge Jones, banker of St. Louis, testified, on page 97 of hearing May 4, 1925, that eight per cent net return was fair return and that a utility must be able to show that return in order to get new money to put into the enterprise when needed.

'' 'Major Smith testified at the May 21st hearing, 1925, five per cent for depreciation and seven per cent for return was correct.' ·

### ''The Issue.

''The issue, now before this court, is the reasonableness of the order made by the Public Service Commission of Missouri finding 'the Southwestern Bell Telephone Company's proposed schedule of rates in its St. Louis exchange are just and reasonable and should be permitted to become effective, beginning July 1, 1925, for a trial period of thirteen months,' and requiring said company 'to keep full and accurate account of the revenues and expenses of operating its exchange at St. Louis, and file a full and complete report thereof with this Commission, on or before July 31, 1926, for the year ending June 30, 1926; that said report shall be in addition to any other reports now required by law.'

''The reasonableness of this order may be determined by an examination of the value placed upon the property of the Southwesten Bell Telephone Company, used and useful in rendering service in its St. Louis exchange, and the amount produced by the proposed schedule of rates, and available, after paying operating expenses, for depreciation and return on the fair value of the property at a fair rate.

''The order of the Commission was on December 7, 1925, affirmed by a judgment of the Circuit Court of the City of St. Louis. From said judgment appeal was taken to this court. Suggestions and memoranda in support of motions to dismiss this appeal have been

filed with this court, and for the sake of brevity points raised in those suggestions are not incorporated in this brief.''

The statement of the case by counsel for the Southwestern Bell Telephone Company is more elaborate than that of the Commission. The foregoing will suffice for a discussion of such questions as will be necessary for a disposition of the case, with our views of the record.

I. What we shall say upon the merits of the test order, made by the Commission, is that the city of St. Louis seems to have briefed the case as if it were a final order for a rate, rather than an order to test out a rate and get the facts. We do not mean to say that even a test-rate order might not be so unreasonable as to justify **Test** interference by the courts, but what we do say is, that such **Order.** orders cannot be viewed in the light of final rate orders. To rob the Commission of the right to test out a rate, would be to destroy the safest method it has of finding what rate will be fair as between the public utility and the public. [State ex rel. v. Public Service Commission, 269 Mo. 525.; State ex rel. v. Public Service Commission, 308 Mo. l. c. 347; State ex rel. v. Public Service Commission, 298 Mo. l. c. 333.]

Even the Federal court in cases involving the question of confiscatory rate, or the contra, recognize the rule that when there is conflict in the evidence, the better method is to test the rate for a time. [Brush Electric Co. v. City of Galveston, 262 U. S. 443.]

The brief of the city (until a reply brief was filed) ignores the difference of rule as between an order to test a given rate, and an order fixing a final rate for the service. The rule as to test rates was first announced in this State in State ex rel. v. Public Service Commission, 269 Mo. l. c. 535. We then and there said:

''If the order made in this case had been one permanent in character the question presented would be entirely different. But such is not the nature of the order made by the Public Service Commission. Our function is to determine the reasonableness of the order, as we find it. The present order is one made for the purpose of making a test, to the end that the real question of a reasonable rate may be ultimately determined. The Public Service Commission is an administrative board, created by the lawmakers, as an arbiter between the general public and the public service corporations, and to this end has been given extensive powers (Laws 1913, p. 602 et seq.), with all its acts subject to court review, however. The fixing of rates is a delicate and vital subject, when both the public interested and the interest of the public service corporations are considered. These corporations should not be crushed by the fixing of inadequate rates, nor should the public be imposed upon by arbitrary business methods adopted by such corporations, which would increase rates. To be

more pointed, such corporations should not be permitted to fix an exorbitant rate for their product or service, and then tie the hands of the Public Service Commission, by showing that at those rates their business is unprofitable. A large per cent of profit on limited sale, will often not yield, in the aggregate, as much actual profit, as a small per cent of profit on larger sales. The price of a product may be made so high as to preclude its general use. These are all vital questions for determination by the Public Service Commission.

"In the instant case the evidence tends to show an exorbitant rate for gas at Columbia. It further tends to show that a reduction in rates would increase the sales or consumption. Grant it, that there is evidence contra. No one knows just what increase of consumption might follow a reduced rate. This can only be determined by actual test. Such was the course pursued by the Public Service Commission by the order made in this case, and it is this 'test' order that we are called upon to declare unreasonable. To say that the Public Service Commission cannot, under the showing made in this case, make an order putting in a test rate as in this case, would be to sap the very vitals of the Public Service Act.' "

This case and this rule has been consistently followed since.

In view of the final disposition of the case which we have in mind, even these remarks on the merits may be somewhat by the wayside. They, and the somewhat lengthy statement we have made, at least, indicates that there has been an investigation of the record, and that the disposition of the case, which the writer has in mind, will not be more disastrous than a disposition on the merits.

II. The city of St. Louis and the Chamber of Commerce of the City of St. Louis were permitted to intervene—the city by final order. The Chamber of Commerce appeared by counsel, but dropped the matter upon the conclusion of the hearing in the circuit court. The motions of the respondents challenge the right of the city to prosecute this appeal. One of the grounds (and we shall discuss but one; as the others will disappear at the conclusion of our ruling) is that under the rules of this court the appellant has wholly failed to make a statement of the case.

Being by order of court made an intervener, and being interested in telephone rates for the city and its inhabitants, the city has the right to appeal from an adverse ruling, under Section 10525 of the Public Service Commission law, which, among other things, says: "The commission, any corporation, public utility or person or any complainant may, after the entry of judgment in the circuit court in any action in review, prosecute an appeal to the Supreme Court of this State." The city is not only an interested party in these rate fixing proceedings, because of its interest as a municipal corpo-

ration, but it is interested in behalf of its citizens.  As a corporation (municipal) it has to use phones and has to pay for them.  The court properly made the city a party to the action, and the terms of Section 10525, supra, are broad enough to authorize it to appeal to this court.  This exact point is not stressed in the briefs, but with it out of the way, all points stressed in respondent's briefs drop out of the case.

The thing that is fatal to this appeal is the absolute failure to make a statement of the case by the appellant.

Our Rule 15, among other things, says: ''The brief for appellant shall distinctly allege the errors committed by the trial court, and shall contain in addition thereto: (1) a fair and concise statement of the facts of the case without reiteration, statements of law, or argument; (2) a statement in numerical order, of the points relied on, with citation of authorities thereunder, and no reference will be permitted at the argument to errors not specified; and (3) a printed argument if desired.  The respondent in his brief may adopt the statement of appellant; or, if not satisfied therewith, he shall in a concise statement correct any errors therein.  In other respects the brief of respondent shall follow the order of that required of appellant.  No brief or statement which violates this rule will be considered by the court.''

This rule makes it the duty of appellant to make a fair and concise statement of the facts of the case.  The character of the statement of the facts is not only indicated by the exact language of the rule, but is further indicated by that portion of the rule which provides that the respondent may accept appellant's statement as the facts of the case, or if respondent cannot accept, that he then shall make a short statement correcting errors in appellant's statement.

In this case appellant makes absolutely no statement of the facts. He does not even say what the evidence tended to show.  A casual examination of the record shows that these witnesses and documents introduced tended to show the facts which the Commission should know in order to make a reasonable test-rate order.  The findings and report of the Commission show that it considered this evidence, yet not a thing is said of such evidence in the so-called statement. Respondents could not agree to it as the facts in evidence, nor could they ''correct the errors therein'' without writing a statement of facts, which they have done, in addition to moving to dismiss for appellant's failure.

This court has been slow to dismiss appeals for the violation of Rule 15, but this is the most flagrant violation since the adoption of the rule in its present form.  Then, in the instant case we have some idea of the question of the reasonableness of this test-rate order. In addition, there is no final order.  When the rate has been tested,

and a final order is made by the Commission, the city would have the right to appeal, if it felt aggrieved by the order. So that under all the circumstances we have no hesitancy in dismissing this appeal for the flagrant violation of our Rule 15. We do not mean to say that we would not dismiss this appeal but for the circumstances we have stated above, but what we do mean is that such action does but little harm to appellant. As said this is the most flagrant violation of the rule since adopted in its present form. We can't do work here without the help of the rules, and we don't have rules if we turn our eyes from them, in a case as flagrant as is this case.

The appeal should be dismissed and it is so ordered. *Gantt, Ragland* and *White, JJ.,* concur; *Blair, J.,* concurs in result; *Walker, J.,* concurs on the ground of a failure of the appellant to comply with Rule 15; *Atwood, J.,* not sitting.