STATE OF MISSOURI at the Relation of ROY McKITTRICK, Attorney General, Appellant, v. MISSOURI PUBLIC SERVICE COMMISSION, LACLEDE POWER & LIGHT COMPANY, and UNION ELECTRIC COMPANY OF MISSOURI.—No. 38733.—175 S. W. (2d) 857.

Court en Banc, November 18, 1943.

*Roy McKittrick,* Attorney General, *Lawrence L. Bradley* and *John S. Phillips,* Assistant Attorneys General, for appellant.

*John P. Randolph* for Public Service Commission of Missouri, *Joseph H. Grand* for Laclede Power & Light Company; *Jones, Hocker, Gladney & Grand* of counsel, and *Robert J. Keefe* for Union Electric Company of Missouri; *John A. Woodbridge* and *Igoe, Carroll, Keefe & Coburn* for respondents.

ELLISON, J.—The Attorney General appeals from a judgment of the circuit court of Cole county affirming an order of the respondent Missouri Public Service Commission, which order sustained a joint application of the Laclede Power & Light Company, The Laclede Gas Light Company and the Phoenix Light, Heat & Power Company for authority to sell to the respondent Union Electric Company of Missouri, the property, rights and franchises now used by the first named company in St. Louis, except certain property owned by

the second named company, all for the base consideration of $8,600,-000, further authorization being asked for the leasing of the excepted property to the same vendee. The procedure in such actions, when contested, is governed by Art. 6, Chap. 35, R. S. 1939 and Mo., R. S. A.[1] The first named applicant will hereafter be called "Laclede Electric"; the second, "Laclede Gas"; the third, "Phoenix"; the vendee, "Union Electric"; and the Public Service Commission, the "Commission." We must sketch the facts before stating the issues on this appeal.

Laclede Electric generates and sells about 15% of the electricity consumed in St. Louis. Most of its 40,000 customers are located in a downtown district. The current is distributed through lines leased from Laclede Gas and Phoenix, and under a franchise which exempts the utility from payment of a certain city tax of 5% on receipts from sales of electricity. For that or some other reason the rates charged by Laclede Electric on some classes of service are lower than those collected by Union Electric, which company does have to pay the city tax, and supplies 85% of the electricity used in St. Louis and environs. Upon authorization of the purchase of the property, Union Electric would switch over current from its own generating sources and supply the present Laclede Electric customers. It would eventually retire all the property purchased except one 20,000 kilowatt turbine. The rest would be worth only salvage value. But complete integration of the two properties could not be effected for an indefinite time, depending largely upon the availability of required materials and manpower, and economic conditions.

The Commission in its order assigned the following reasons for approving the application: (1) the merger would ultimately result in the integration of the two public utility enterprises and the elimination of wasteful competition, which would benefit the public; (2) it would afford an opportunity for reducing the cost of furnishing electric service by eliminating duplicate facilities and organizations; (3) it would promote public safety by relieving congestion on public traffic-ways through the removal of duplicated distribution facilities therefrom; (4) it would improve the financial stability of the system, since the Laclede Electric is not in as favorable position as the Union Electric in that regard; (5) it would give better assurance to present customers of Laclede Electric of uninterrupted service, because Union Electric's system has large and more diversified facilities for service.

Sec. 4 of the Commission's order approving the sale provided (italics ours): "That the rates of the Laclede Power & Light Company *in effect at the time of the transfer of the properties* herein authorized *shall be continued in effect* by Union Electric Company of Missouri *to those who are customers of the Laclede Power & Light Company* at

---

[1] All references to chapters, articles and sections of the statutes refer to these editions thereof. Italics in quotations are ours unless otherwise noted.

the time of the transfer and who elect to continue to receive service at the same premises through facilities acquired from the Laclede Power & Light Company and under the same conditions of service *unless and until such rates be cancelled or changed in whole or in part, either prior to, at or after the time of such transfer, by Order of this Commission, after notice and opportunity for hearing*'' (or until rates are changed on the initiative of the Union Electric and approved by the Commission).

At the hearing before the Commission, counsel for the four companies involved appeared and participated. And the following parties appeared as interveners: the Attorney General; the Office of Price Administration of the Federal Government; the City of St. Louis; certain preferred stockholders; and two parties apparently interested financially in the transaction. The Commission had given notice of the time and place of the hearing to these parties and interveners, and to many other persons and entities, including the Federal Securities and Exchange Commission, who did not appear. All of the above parties who had appeared, abided by the Commission's order and made no effort to carry the contest further—except the Attorney General. He alone filed a motion for rehearing, obtained the writ for review by the circuit court, and prosecuted this appeal.

Numerous theories and issues of fact were tendered by the parties during the hearing before the Commission, and in the Attorney General's motion for rehearing. The only assignments in his brief here are that the trial court erred: (1) because Sec. 4, supra, of the order of the Commission allowing the Union Electric to continue its own rate and the separate lesser rate of Laclede Electric, in effect authorized a special, discriminatory lesser rate to the latter's customers, in violation of Sec. 5645(2) and (3); (2) in finding the question of rates was not involved in the proceeding; (3) in refusing to remand the proceeding to the Commission so that it might consider evidence as to the rates involved; (4) and because there was no showing that any benefit would accrue to the customers of Laclede Electric and Union Electric from the proposed merger.

The Attorney General has not filed a printed abstract of the record, contending that is unnecessary under Sec. 5693. This section allows ''any corporation, public utility or person or any complainant'' to prosecute an appeal from the judgment of the circuit court on a writ for review of the Commission's proceedings, and then provides: ''The original transcript of the record and testimony and exhibits, certified to by the Commission and filed in the circuit court in any action to review an order or decision of the commission, together with a transcript of the proceedings in the circuit court, *shall constitute the record on appeal* to the supreme court or any court of appeals. Where an appeal is taken to the supreme court or any court of appeals, the cause shall, *on return of the papers* to the supreme court

or any court of appeals, be immediately placed on the docket of the then pending term by the clerk of said court *and shall be assigned and brought to a hearing in the same manner as other cases* on the then pending term docket, but shall have precedence over all civil causes of a different nature pending in said court."

This statute was first enacted in substantially its present form by Laws Mo. 1913, sec. 114, p. 644. But there is another statute, Sec. 1194, which has been in force ever since it was Sec. 2253, R. S. 1889, so far as concerns the question under discussion. And it has been recognized by the General Assembly and amended as late as Laws Mo., 1939, p. 276. It deals with civil cases, in general, and provides that the appellant or plaintiff in error shall cause to be filed in the office of the proper appellate court "a perfect transcript of the record and proceedings in the cause," or in lieu thereof a short form transcript, then continuing: "and shall thereafter, within the time and manner as is now or may hereafter be *prescribed by the rules* of such appellate court, *file printed abstracts of the entire record* of said cause in the office of the clerk of such appellate court, . . ." Secs. 1195 and 1196 authorize the appellate courts to make rules carrying into effect the provisions of Sec. 1194 and designating what parts of records may be omitted from the transcript. We have such rules, Rules 11, 13 and 14, and they require a printed abstract of the record.

It was held in State ex rel. May Dept. Stores Co. v. Haid, 327 Mo. 567, 582-5, 38 S. W. (2d) 44, 51-3, that the whole "original transcript" of the proceedings before the Commission and in the circuit court (as called for by Sec. 5693, supra) is the record proper in the cause; and that no bill of exceptions and motion for new trial are necessary. Nevertheless, it is a civil proceeding, and Sec. 5693 itself provides that after the cause is docketed it "shall be assigned and brought to a hearing *in the same manner as other cases*." Harmonizing the section with Sec. 1194 it seems to us the transcript specified in Sec. 5693 is the "perfect transcript" initially filed under Sec. 1194; but that the former section does not override the latter as to the requirement that the abstract of the record be printed for the appellate hearing, as in other civil proceedings. It has been so understood by this court and the bar heretofore; and we have frequently sustained stipulations or motions allowing *exhibits* to be brought up without printing, as we may do under Sec. 1196, supra, and in the exercise of inherent power.

The transcripts brought up from the Commission usually are long, technical and full of engineering and accounting data. In the proceedings before the Commission and the circuit court engineers and accountants are available to present and interpret the exhibits. In this case the record totals 790 pages, in four separate binders, without consecutive numbering throughout and without an index except as to the witnesses and the *admission* of the exhibits in the record. And we have only one copy for the six judges sitting. If the record be

not printed we would be compelled to require a fuller statement of facts in the brief, covering the sequence and purport of the proceedings, the testimony and documentary evidence to be reviewed here. We hold a printed transcript is required, condensed as counsel may agree; and that exhibits may be omitted on an approved stipulation or motion when their significance is shown by the briefs. But since the question is one of first impression and the point was not raised by respondents until the oral argument, we shall proceed with the decision of the case.

■ Next in logical order is respondents' challenge of the Attorney General's official right to apply for a rehearing, petition for review and appeal in the cause. Sec. 5686 broadly provides that "complaint" may be made by the Commission of its own motion, or by "any corporation or *person*, chamber of commerce, board of trade, or any civic, commercial, mercantile, traffic, agricultural or manufacturing association or organization, or any body politic or municipal corporation," by petition or complaint in writing. Although, as here, the proceeding be instituted by an ex parte application for an order, yet if any authorized party intervenes and *contests* the order the proceeding is then regarded as one on "complaint," and the procedure prescribed by Art. 6, Chap. 35 applies.

Sec. 5689 permits "any corporation or *person* or public utility *interested*" in an order or decision of the Commission, to apply for a rehearing. Sec. 5690 provides that if the rehearing is denied "the *applicant*" may apply to the circuit court for a writ of review. Sec. 5693 authorizes "the commission, any corporation, public utility or *person* or any *complainant*," to appeal from the judgment of the circuit court, as in civil cases, except as otherwise provided in the Article. Sec. 1184, covering appeals generally in civil cases, provides the appellant must be "aggrieved." It is evident that the foregoing provisions contemplate the party applying for a rehearing, writ of review or an appeal shall be a party to the record, interested and aggrieved. At least this is true of appeals. On that point ■ State ex rel. City of St. Louis v. Public Service Comm., 317 Mo. 815, 826(II), 296 S. W. 790, 794(2), said: "Being by order of court (and the Commission) made an intervener, and being interested in telephone rates for the city and its inhabitants, the city has the right to appeal from an adverse ruling, under (now Sec. 5693)."[2] The Attorney General was a party to the record in the hearings before the Commission and the circuit court. Was he *interested* or *aggrieved?*

The Constitution, Sec. 1, Art. V, merely provides generally that the Attorney General "shall perform such duties as may be *prescribed*

[2]See also, Ohio Contract Carrier's Assn. v. Public Util. Co., 140 Ohio St. 160, 42 N. E. (2d) 758, 759(1, 2); Hammond-Chandler Lbr. Co. v. Industrial Comm., 163 Wis. 596, 599, 158 N. W. 292, 294.

*by law,*"[3] (save as to certain administrative duties on State Boards, etc.) The italicized phrase, "prescribed by law," by the weight of authority means, prescribed by *statute* law. 22 Words & Phrases (Perm. Ed.), p. 413. However, we have long had a statute, now Sec. 645, adopting the common law of England and all statutes and acts of Parliament made prior to the fourth year of the reign of James the First, which are of a general nature, not local to that kingdom, and not repugnant to or inconsistent with the Constitution of the United States and the Constitution and *statutes* of this State in force for the time being. This section evidently has been construed as adopting not only the common law rights and remedies of litigants, but also such common law *powers* of public officers as were possessed by similar officers in England—either that, or else we view the English common law, statutes and history as aids to interpretation. For it has been held in a majority of the states, including Missouri, that the Attorney General does have common law powers.[4]

Nevertheless our statutes fix his duties in great detail. The index to R. S. 1939 contains well over 150 statutory items covering these duties. The most general sections appear in Art. 1, Chap. 85. One of these, Sec. 12898, provides he shall assist prosecuting and circuit attorneys in the discharge of designated duties when *directed* by the Governor. Another Sec. 12899, says he shall give his opinion in writing to the General Assembly and certain officers and departments of the State government *when required*. And Sec. 12902 provides he may "at the *request*" of the officers and subordinate agencies of the State government assign an assistant Attorney General to represent them in the Supreme Court. His broadest discretionary duties are in quo warranto, and under Sec. 12901. The latter statute empowers him to institute "all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state" and to enforce its claims; and to "appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved."

The Attorney General relies on this Sec. 12901. In terms it seems applicable; and it is practically declaratory of the common law. But before that view can be accepted two important questions must be answered: (1) have Sec. 12901 and the common law been limited or circumscribed by other later statutes, as regards the Public Service

---

[3]Sec. 18 of Art. V of the Constitution of 1820 provided the Attorney General "shall perform such duties as *shall* be *required* of him by law." Sec. 16, Art. V, Constitution of 1865, said, "shall perform such duties as *may* be *required* of (him) by law."

[4]5 Am. Jur. sec. 6, p. 235; 6 C. J. sec. 13, p. 809; 7 C. J. S. sec. 5, p. 1222; State ex rel. Barrett, Atty. Gen. v. Boeckler Lbr. Co., 302 Mo. 187, 205-6, 257 S. W. 453, 456; Dickey v. Volker, 321 Mo. 235, 251-2, 11 S. W. (2d) 278, 284, 62 A. L. R. 858; Thatcher v. St. Louis, 343 Mo. 597, 601-2, 122 S. W. (2d) 915, 916.

Commission; (2) and is the State "interested" within the meaning of the statute. On the first question, there can be no doubt that the Constitution does *not* prohibit the General Assembly from limiting the common law powers of the Attorney General. For while, (as we have already conceded) the foregoing clause in Sec. 1, Article V thereof arms him with common law powers, yet it is also addressed to the future and even more clearly comprehends statutory powers. And Sec. 645, supra, which has been in force substantially as now ever since 1816, has always provided that the common law must yield to our own sovereign legislation.

Looking then to our statutes, as affecting the Public Service Commission, it is to be noted that a number of them specifically require the Attorney General to perform certain duties with respect to other public officers, and to various boards and commissions, some of which have counsel of their own, such as the Insurance Department, the State Highway Commission, the Unemployment Commission and the Workmen's Compensation Commission. But there is no mention in them anywhere of the Public Service Commission. On the other hand, the Public Service Commission Act, adopted in 1913, was made primarily exclusive in its field. It was so held by this court en banc the next year in State ex inf. Barker, Atty. Gen. v. Kansas City Gas Co., 254 Mo. 515, 532(4), 163 S. W. 854, 857(6), where the effort of the then Attorney General was to proceed directly against a utility by mandamus to compel it to furnish an adequate supply of gas to Kansas City, ignoring the Public Service Commission. And in another banc case the same year practically the same expression was used, viz., that the Commission "occupies the entire field" of regulation of utility rates and service. State ex rel. Mo. Southern Rd. Co. v. Pub. Serv. Comm., 259 Mo. 704, 723, 168 S. W. 1156, 1162(IIIa).

Furthermore, Sec's 5582 and 5583 provide the Governor—not the Commission—shall appoint its counsel; that he shall possess the qualifications of a judge of the Supreme Court and serve for a term of six years; that he shall "represent and appear for the Commission in all actions and proceedings involving any question under this or any other law, or under or in reference to any act, order, decision or proceeding of the Commission, and if directed to do so by the Commission, to intervene, if possible, in any action or proceeding in which any such question is involved." He is further authorized "to commence and prosecute *in the name of the State* all actions and proceedings authorized by law and directed or authorized by the Commission, . . . and generally to perform all duties and services as attorney and counsel to the Commission which the Commission may reasonably require of him." And finally he is expressly commanded "to represent the *public* in all rate hearings before the Commission at its office" and to advise the public on request, as to their rights under the Act. It was held in State ex rel. St. Louis v. Pub. Serv. Comm., 331 Mo.

1098, 1112(7), 56 S. W. (2d) 398 404(8), that his duty to the public extended not only to rate cases but to all other classes of cases before the Commission.

In view of these implicit as well as explicit provisions, it is clear the Attorney General has no power to represent, control or impede the Commission in its functioning. And if this be true, he cannot do the same thing indirectly by intervention. This conclusion finds support in decisions from other jurisdictions. Darling Apartment Co. v. Springer (Del.), 22 Atl. (2d) 397, 137 A. L. R. 803, 820, annotation; Pierce v. Superior Court, I Cal. (2d) 759, 761(2), 37 Pac. (2d) 460, 461(2), 96 A. L. R. 1020, 1023(3); Dunn Const. Co. v. Craig, 191 Miss. 682, 712(11), 2 So. (2d) 166, 174-5(11).

But it must also be remembered that the Commission is an administrative tribunal before which interested parties may appear. And while the Attorney General cannot represent or control it, yet we can see no reason why he cannot appear before it representing the State as a litigant, just as counsel for any other litigant would do— if the State has a real interest involved—and this notwithstanding Sec. 5583 provides the counsel of the Commission shall also represent the public. For that representation is general and not partisan. In nearly every such case constituent members of the public are further represented by their own counsel, as the City of St. Louis, the O.P.A., the preferred stockholders and other financial interests were in the hearing before the Commission in this instance. If they may appear by their counsel, the State should be permitted to do the same.

But carrying out this reasoning, when the State does so appear it should have the same kind of interest that these private litigants claim—something concrete, such as a pecuniary interest, or one definitely affecting the general welfare of the State or its obligations and functioning, as distinguished from interests that actually are private or local. The whole theory of public utility regulation by Commission is based on the premise that such enterprises are charged with a public interest. In that sense every case before the Commission involves public rights. And if that consideration alone were sufficient to admit the Attorney General into the litigation, he could always intervene in behalf of one or more citizens of every city, town, village and community in the State. This obviously would be officious intermeddling. It will not do to say he can intervene in every such case, marshaling the strong legal forces and vast resources of the State against one or another of adversary interests that really are local or private. The pattern of the Public Service Commission Act shows the legislative intention was that the State, through its Commission, should hear and decide *both* sides of the controversy, not that the Attorney General should appear and champion *one* side.

So the question is, what character and extent of public interest will justify the Attorney General in entering a proceeding before

the Commission, in behalf of the State? We list below[5] the cases cited by the Attorney General on this question. Of these, In re Debs was on habeas corpus. The petitioner was in custody for contempt, for violation of a Federal court injunction issued at the instance of the Attorney General of Illinois, restraining petitioner and others from interfering by a railroad strike with interstate commerce and the movement of U. S. mail between Chicago and outstate Illinois and other states. The writ was denied. In this case the court said the U. S. Government had a property interest in its mails, but that without such interest the obligation which the Government is under "to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the *general welfare,* is *often* of itself sufficient to give it a standing in court."

U. S. v. San Jacinto Tin Co. and U. S. v. Bell Tel. Co., supra, both ruled the Attorney General of the United States could maintain a suit to cancel a U. S. patent, either for land or an invention, when procured by fraud. The decision held the right of the Government to maintain such an action depends upon the same general principles as would govern a private citizen; but that if the Government owes no obligation to the public or to any individual, and has no pecuniary or other interest of its own, the action will not lie.

Indiana v. Ohio Oil Co., supra, was a suit by the Attorney General to enjoin an oil company from wasting natural gas by permitting it to escape from oil wells into the open air in violation of a statute, thereby impoverishing the state's natural resources upon which many hundreds of thousands of people depended, it being further alleged there was no adequate remedy at law. The court conceded the suit was novel, but that the wrongful act could be enjoined as a public nuisance.

We are unable to discover anything in these cases supporting the Attorney General's theory. In the Debs and Indiana cases the state-wide welfare was threatened, in one by violence and in the other by a public nuisance, and there was no adequate remedy at law. And a contrary holding in the San Jacinto and Bell cases would have meant that no legal redress was open to the Government of the United States through the initiative of its Attorney General when patents had been obtained from it by fraud, whereas the same would not be true of private citizens. The honor and sovereign powers of the Government could not have been otherwise maintained.

The only Missouri case cited by the Attorney General is State ex rel. Delmar Jockey Club v. Zachritz, supra. It was an original pro-

[5]State ex rel. Delmar Jockey Club v. Zachritz, 166 Mo. 307, 313(3), 65 S. W. 999, 1000, 89 Am. St. Rep. 711; In re Debs, 158 U. S. 564, 584, 39 L. Ed. 1092, 15 S. Ct. 900; U. S. v. San Jacinto Tin Co., 125 U. S. 273, 285-6(3), 31 L. Ed. 747, 8 S. Ct. 850; U. S. v. Bell Tel. Co., 128 U. S. 315, 367, 32 L. Ed. 450, 9 S. Ct. 90; Indiana v. Ohio Oil Co., 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627.

ceeding in prohibition to prevent the respondent circuit judge from exercising jurisdiction over a suit in equity brought by the then Attorney General in behalf of the State against the relator Jockey Club, to cancel certain licenses signed by the State Auditor authorizing race horse betting at relator's track in the city and county of St. Louis, under Sec. 7419, R. S. 1899; and to enjoin the use of the licenses pendente lite. The contention was that they had been obtained wrongfully and surreptitiously, and were therefore spurious and the betting thereunder unauthorized.

The opinion held "it would seem, on the face of the statute" that the Attorney General could maintain the suit—unless the State must have a pecuniary interest in the controversy, as the respondent there contended. On that point the decision said the State did have such an interest because the statutory license fees went into the State treasury; but declared a pecuniary interest is often unnecessary if ▓▓▓ the general welfare be threatened with injury through wrongdoing—citing the Debs case, supra. Then it concluded on another (procedural) theory, that prohibition was not the proper remedy because the circuit court had jurisdiction to determine whether the State could maintain the action. A later banc decision, State ex rel. Mo. Pac. Ry. Co. v. Williams, 221 Mo. 227, 262, 120 S. W. 740, 750, speaking of this Zachritz case, said, "It is obvious that the decision rests upon the fact that the State had a direct pecuniary interest, in addition to its general governmental control." But the opinion might well have been based on the theory of the patent cases referred to in the second preceding paragraph, that the sovereignty of the State was involved.

The respondents cite several Missouri and foreign cases.[6] The first of these are State ex inf. Crow, Atty. Gen. v. A., T. & S. F. Ry. Co., and State ex inf. Crow v. Mo. Pac. Ry. Co. These, respectively, were original actions in quo warranto attacking certain "reconsignment charges" exacted by the defendant railroads from the grain dealers in Kansas City and St. Louis on carloads of grain left standing on sidetracks for "inspection, barter or sale," before final consignment orders were given. The petition alleged such charges were not made in other cities west of the Mississippi River, and constituted a discrimination against the "locality of Kansas City" in the first case and St. Louis in the second. Held: the actions did not concern the public interest, but sought vindication of private rights; and that the con-

[6]State ex inf. Crow v. A. T. & S. F. Ry. Co., 176 Mo. 687, 75 S. W. 776; State ex inf. Crow v. Mo. Pac. Ry. Co., 176 Mo. 718, 75 S. W. 888; State ex rel. Mo. Pac. Ry. Co. v. Williams, supra, 221 Mo. l. c. 261, 120 S. W. l. c. 749; State ex rel. Barker, Atty. Gen. v. C. & A. Rd. Co., 265 Mo. 646, 178 S. W. 129, L. R. A. 1916C, 309; State ex inf. McAllister, Atty. Gen. v. Albany Drain. Dist., 290 Mo. 33, 234 S. W. 339; King County v. Seattle School Dist., 278 Fed. 46, 48(2), overruled on other grounds, id., 263 U. S. 361, 68 L. Ed. 339, 44 S. Ct. 127.

troversy was within the jurisdiction of the then State Railroad Commission. For these reasons the writ was denied. The opinion pointed out such actions could be maintained by the State only where the "whole community" was interested, meaning, as we understand the whole State or such part thereof as would substantially affect the whole.

Conversely, in the Williams case the circuit attorney of St. Louis undertook to enjoin certain railroads from conspiring to charge and collect excessive passenger fares in St. Louis and the State of Missouri. This court prohibited him, holding the scope of the action was statewide, and that it was the sole province of the Attorney General to represent the State in such suits, the authority of the circuit and prosecuting attorneys being limited to their own counties. Two similar cases are cited below.[7]

In the Barker-C. & A. Rd. case the Attorney General sued a number of railroads to recover that part of freight rates and passenger fares in excess of the statutory maximum, which had been collected under protection of an injunction during the pendency of rate litigation in the Federal court, the litigation having been ultimately decided in favor of the State. The action was brought in behalf of the State and "more than 100,000" shippers and passengers therein who had been thus overcharged. The court held it was not a suit involving the public interest, but for the enforcement of private rights; and that while the State could sue to recover any excess charges it had been compelled to pay, it could not sue in behalf of individual shippers and passengers. A similar ruling was made in the Albany Drainage District case, where the Attorney General brought quo warranto assailing certain proceedings in the circuit court whereby the District, a public corporation, had extended its boundaries.

Another phase of the rule is reflected in the Seattle School District case, supra, cited by respondents. There it was said to be the function of the Attorney General "to represent the public, the entire community, and not a limited portion thereof," but (quoting from another case) "if there were no other remedy for a great wrong, and public justice and individual rights were likely to suffer *for want of a prosecutor* capable of pursuing the wrongdoer and redressing the wrong, the courts would struggle hard to find authority for the Attorney General to intervene in the name of the people." See also Woulfe v. Associated Realties Corp., 130 N. J. Eq. 519, 526-7, 23 Atl. (2d) 399, 403(7). This was shown in Dickey v. Volker, supra, 321 Mo. 1. c. 246, 11 S. W. (2d) 1. c. 281(1), 62 A. L. R. 858, to be the principle underlying the right of the Attorney General to sue for the enforcement of charitable trusts. But in the instant proceeding

---

[7]State ex rel. Chilton County v. Butler, 225 Ala. 191, 142 So. 531; Capitol Stages, Inc., v. State ex rel. Hewitt, Dist. Atty., 157 Miss. 576, 128 So. 759.

the citizens of St. Louis, who alone were affected by the controversy, did have a representative in the City Counselor of St. Louis. He appeared and contested, but after the hearing before the Commission abandoned the struggle which the Attorney General seeks to carry on.

For all the foregoing reasons it is our opinion, and we hold, that the Attorney General had no right to intervene in the proceeding, or to apply for a rehearing, writ of review and appeal. We are not cited to any case where it has ever been done before. And the fact that he did participate in the hearing and review does not change the nature and character of the State's interest or create a right where none existed before. Ohio Contract Carriers' Ass'n, Inc. v. Public Util. Comm., supra, 140 Ohio St. l. c. 163, 42 N. E. (2d) l. c. 759(3); Page v. Commonwealth, 157 Va. 325, 330(3), 160 S. E. 33, 34(2).

█ Having held the Attorney General had no right to prosecute the writ of review in the circuit court and this appeal here, we are not bound to pass on the other assignments made in his brief. But there is one important question which the parties have treated as being in the case, and have briefed on the merits. We therefore consider it. It is the Attorney General's contention that Sec. 4 of the Commission's order violated Sec. 5645(2, 3) by continuing in force the separate rates of the Laclede Electric and the Union Electric until such rates should be changed by the Commission either prior to, at or after the transfer of the property sold and leased, to the Union Electric. The provisions of the statute are as follows:

"2. No gas corporation, electric corporation, water corporation or municipality shall directly or indirectly by any special rate, rebate, drawback or other device or methods, charge, demand, collect or receive from any person or corporation a greater or less compensation for gas, electricity, water or for any service rendered or to be rendered or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.

"3. No gas corporation, electric corporation, water corporation or municipality shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect, whatever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The order of the Commission was expressly based on the theory that the anticipated benefits from the sale would accrue from the *integration* of the two properties; and that that integration could not be effected for an indefinite time and would entail the retirement of part of the

property, the installation of new property and materials, and expenditures of money therefor, all of which might enter into the fixing of rates for service furnished by the integrated property. The Commission therefore very cautiously continued the established rates of the two systems to the customers of each until "prior to, at or after the transfer." In other words the existing rates were permitted to stand ad interim. The Attorney General contends this made the lesser Laclede Electric rate a special rate, rebate, drawback or special advantage; that the question of rates was in the case and should have been decided; and that the cause should be remanded for that purpose.

We do not think so. A similar problem confronted the Commission twenty years ago when it authorized the Kinloch Long Distance Telephone Company of St. Louis and several smaller companies to sell their properties to the Southwestern Bell Telephone Company. It was an established engineering fact that the larger the exchange the higher its rates would have to be. For that reason the petitioning companies asked for an order authorizing an increase in rates in anticipation of the merger. But the Commission held that since the unification could not be effected for a year or more, the Bell Company would be required to operate the exchanges of the several ▮▮▮▮ companies at existing rates until the actual physical merger had been effected. In re Kinloch L. D. Co., 12 Mo. P. S. C. 400, 415.

The same course was followed by the California Railroad Commission in the exchange of two electric distribution properties with different rates, awaiting the outcome of a separate case involving the rates of one of the companies. P. U. R. 1923C, 535, 538. And when one electric company bought the properties of another in a different city where higher rates prevailed, and connected its plant thereto by transmission line, it was held the purchasing company was not required to establish its own lower rates in the latter city unless and until required to do so by the Public Service Commission. Alabama Power Co. v. Patterson, 224 Ala. 3, 138 So. 421.

This court has held several times that the Commission may establish test or experimental rates pro tempore[8]; and that a utility may have two or more rates if they be for different characters of service.[9] It was pointed out in the Buzard case just cited that having two or more rates for the *same* service is the thing forbidden by the nondiscrimination statute, Sec. 5645, supra, on which the Attorney General relies. But he thereby assumes the service rendered by the Laclede

---

[8]State ex rel. Watts Eng. Co. v. Pub. Serv. Comm., 269 Mo. 525, 535, 191 S. W. 412, 415, Ann. Cas. 1917E, 786; State ex rel. Wash. Univ. v. Pub. Serv. Comm., 308 Mo. 328, 347, 272 S. W. 971, 974(6); State ex rel. Campbell Iron Co. v. Pub. Serv. Comm., 317 Mo. 724, 731, 296 S. W. 998, 1001(2); State ex rel. City of St. Louis v. Pub. Serv. Comm., 317 Mo. 815, 825, 296 S. W. 790, 794(1).

[9]State ex rel. K. C. Pr. & Lt. Co. v. Buzard, 350 Mo. 763, 168 S. W. (2d) 1044, 1046(4).

Electric and the Union Electric is the same, notwithstanding the greater assurance of uninterrupted and efficient service which the customers of the latter company enjoy because of its superior position in equipment and financing—as found by the Commission; and ignores the fact that there is as yet no intelligent basis for fixing a common rate. Until the unification of the two systems is accomplished or the effect thereof is reasonably discernible, we think and hold the Commission in its reasonable discretion is justified in treating the two systems as separate units for rate purposes, notwithstanding the ownership and control of both have come into the same hands. This disposes of the other kindred assignments that the question of rates is involved; and that the cause should be remanded to receive evidence thereon.

As to the remaining assignment, that there was no showing any benefit would accrue to the customers of the two companies from the proposed merger. This was a question of fact. We stated in the beginning the conclusions reached by the Commission on that point. Under Sec. 5703, the burden is on the complainant "to show by clear and satisfactory evidence that the . . . order of the commission complained of is unreasonable or unlawful." No such showing has been made. As already stated the City of St. Louis and the interested parties have dropped out of the case.

The judgment is affirmed. All concur except *Gantt, J.,* absent.