MIKE MCGINLEY ET AL., APPELLANTS, V. WHEAT BELT
PUBLIC POWER DISTRICT, A PUBLIC CORPORATION AND
POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA,
ET AL., APPELLEES,
RICHARD W. DUNN ET AL., INTERVENORS-APPELLEES.

332 N.W.2d 915

Filed April 29, 1983. No. 82-273.

Wright, Simmons & Selzer, for appellants.

John Peetz, P.C., for appellees Wheat Belt P.P.
Dist. et al.

Steven C. Smith of Van Steenberg, Brower,
Chaloupka, Mullin & Holyoke, for intervenors-
appellees.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, HASTINGS, and
CAPORALE, JJ., and BRODKEY, J., Retired.

KRIVOSHA, C.J.

The plaintiffs in this action, electric customers of Wheat Belt Public Power District, appeal from an order entered by the District Court for Cheyenne County, Nebraska, which dismissed their petition. Following the institution of the suit by the plaintiffs, certain other customers of Wheat Belt Public Power District intervened in the action and joined with Wheat Belt in defending the action. For reasons set out in this opinion, we reverse and remand.

The record reveals that Wheat Belt Public Power District is a public corporation and political subdivision created pursuant to Chapter 70, article 6, of the statutes of the State of Nebraska. As a public electric utility, it is one of 25 members of Tri-State Generation & Transmission Association, a multistate wholesale distributor of electric energy. Originally, Tri-State was a transmitting facility only, which acquired all of its power from the U.S. Bureau of Reclamation and, later, from Basin Electric Power Cooperative. Due to increasing load growth among its members, Tri-State exceeded its power allocations in the early 1970s and was faced with the decision whether to buy power from a third source or to become a generating facility. This load growth was primarily caused by an increased use of seasonal irrigation in the Tri-State area. The increased peak loads of seasonal users resulted in voltage drops due to high loads and insufficient generating capacity.

In order to meet the rising power demands of its members and to stabilize voltage problems, Tri-State chose to become a generating facility and began construction of a peaking unit which would provide energy during periods of high seasonal demand. The unit was constructed at Wray, Colorado, and came on line in 1975. In 1977 Tri-State constructed a second peaking unit at Burlington, Colorado.

On February 3, 1975, Tri-State informed Wheat Belt that a surcharge or "ratchet" would be charged

all customers of Tri-State, including Wheat Belt. Tri-State advised Wheat Belt that the ratchet would be assessed on the basis of Wheat Belt's summer peak demand. Wheat Belt considered three alternatives to deal with the imposed ratchet: (1) Refuse to add new irrigation customers and thereby stop irrigation growth; (2) Allocate the ratchet equally among all irrigation customers; (3) Create two classes of irrigation customers based on the date the customer requested service. The last alternative was apparently based upon Wheat Belt's notion that it was the new customers who were causing the increased summer peak demand, thereby causing the imposition of the ratchet.

On May 19, 1975, the Wheat Belt board of directors announced that there would be two classes of irrigation customers in the future. One class, called "Rate Class 75" would be all customers who were receiving service from Wheat Belt before February 3, 1975, or who had notified Wheat Belt before February 3, 1975, that they desired service and who were put in service before August 15, 1975. A second class, to be called "Rate Class 76," would consist of those customers put in service after August 15, 1975, that had not been committed to by February 3, 1975. The rationale for the subclassification was to protect the old customers from having to pay any increased cost associated with Tri-State's construction of the peaking units, on the theory that they "were not creating a major problem." Because the members of Rate Class 76 were assessed the greatest portion of the ratchet, the rates for similar service for the two classes of customers were significantly different. The evidence discloses, as an example, that in 1976 the charge per horsepower for members of Rate Class 75 was $.39, while the members of Rate Class 76 obtaining identical service paid $5.02 per horsepower. This difference continued throughout the years, and in 1981, while the members of Rate Class 75 consumed 31,830.5 horsepower, their charge per

horsepower was only $5.75, while members of Rate Class 76, who used 11,198 horsepower, were charged a rate of $17.15 per horsepower. The evidence conclusively established that the only difference between consumers in Rate Class 76 and those in Rate Class 75 was the date upon which they requested service. The consumptive characteristics of both classes were shown to be similar in all respects. Both classes of customers raised similar crops in the same geographical area, used the energy in the same way, and had identical energy and horsepower demand charges assessed. While Wheat Belt maintained that there were higher horsepower motors used by consumers in Rate Class 75, it was demonstrated that there are almost as many high horsepower motors in Rate Class 76 as there are in Rate Class 75. The load factor was also shown to be the same for the two classes and, despite the fact that members of Rate Class 75 were placed on a voluntary, unmonitored rotation schedule in which each well was to be operated only 2 out of 3 days, there was evidence that both classes were irrigating in the same way and that many Rate Class 75 customers simply did not comply with the rotation policy. The evidence further disclosed that in addition to allocating the principal portion of the ratchet to consumers in Rate Class 76, Wheat Belt also allocated a ratchet-free block of U.S. Bureau of Reclamation power only to consumers in Rate Class 75.

The plaintiffs presented expert testimony at trial regarding the propriety of the ratchet allocation formula used by Wheat Belt. Donald Salow, a consulting engineer specializing in utility operations and rate setting, testified that customers in both Rate Class 75 and Rate Class 76 receive equal benefits from construction of the peaking unit. After analyzing the two rate classes Salow concluded that there were no differences in cost of service which would warrant this disproportionate ratchet allocation. In addition, Wheat Belt's practice of allocating

the benefit of ratchet-free Bureau of Reclamation power entirely to Rate Class 75 was characterized by Salow as a "deviation" from the norm that was, in his opinion, unfair and unreasonable. He also testified that if none of the Tri-State members had added new customers or had little or no load growth after the peaking units were constructed, the existing customers would have simply paid for the debt retirement through higher energy and demand charges.

Henry Rice, a consulting engineer and former employee of Nebraska Public Power District, testified that exit and entry into a system should make no difference between customers who take similar service under similar conditions. In his opinion, the present ratchet allocation between Rate Class 75 and Rate Class 76 was neither proper, reasonable, fair, nor nondiscriminatory.

Intervenors' expert, Stephen Brown, testified that although it is possible to allocate the ratchet equally among all irrigators, Wheat Belt's formula nevertheless was an equitable distribution consistent with the philosophy of charging those who create the cost with the payment of the cost.

Before turning our attention to the principal issue involved in this appeal, there are several preliminary matters which need to be considered. The first issue is the propriety of various members of Rate Class 75 intervening in this action. An examination of their briefs and the record makes it quite clear that their interests in this matter were identical with the action taken by Wheat Belt and were being fully and completely presented by Wheat Belt. They therefore did not have a direct interest different than Wheat Belt's. The fact that their rate would be affected if Wheat Belt's action in setting the two rates was declared invalid was not sufficient to permit them to intervene. In *Cornhusker Electric Co. v. City of Fairbury*, 131 Neb. 888, 270 N.W. 482 (1936), we held that a ratepayer's allegation that his rates

would be increased if the challenged rate was not maintained was not so direct an interest as to entitle the ratepayer to intervene. Also, in *Noble v. City of Lincoln*, 158 Neb. 457, 471, 63 N.W.2d 475, 484 (1954), we said: "Taxpayers are not qualified to intervene in matters of public interest that are prosecuted or defended for a governmental subdivision by its proper officials. Best & Co., Inc. v. City of Omaha, 149 Neb. 868, 33 N.W.2d 150; City of Omaha v. Douglas County, 125 Neb. 640, 251 N.W. 262; State ex rel. Randall v. Hall, 125 Neb. 236, 249 N.W. 756." It appears to us that the rationale underlying that rule applies equally to a case challenging a rate established by a governmental subdivision. The intervenors did not have such direct interest that was not otherwise being adequately protected by Wheat Belt and should not have been permitted to intervene. Cases of this nature are sufficiently complicated without adding interlopers.

A second issue, raised by Wheat Belt, is the propriety of the court reviewing the action of Wheat Belt in setting the rates. Wheat Belt argues that rate making is wholly a legislative function and that the courts, therefore, have no right to impose their judgment in place of that of the elected body. That question has already been answered by this court contrary to Wheat Belt's position. In *Erickson v. Metropolitan Utilities Dist.*, 171 Neb. 654, 659, 107 N.W.2d 324, 327 (1961), this court said: "In the performance of the functions under the power granted by the statute the district in the matter of service rendered and rates to be charged therefor, the question of whether or not the district has acted unreasonably and arbitrarily has been recognized as a matter proper for judicial examination and review."

And specifically in *York County Rural Public Power Dist. v. O'Connor*, 172 Neb. 602, 607-08, 111 N.W.2d 376, 379 (1961), we said: "If the plaintiff district is to be operated in a successful and profitable manner, someone must determine the rate neces-

sary to permit it to do so. Section 70-655, R.R.S. 1943, requires plaintiff's board of directors to make that decision. It also provides that the rates be fair, reasonable, and nondiscriminatory. In the case of a dispute between the plaintiff and its customers as to the reasonableness of the rates charged, who has the authority to review the action of the board of directors? Section 70-656, R.R.S. 1943, provides: 'The Nebraska State Railway Commission shall have no jurisdiction over the rates, tolls, rents and charges of districts organized under sections 70-601 to 70-679.' If the railway commission does not have authority, who does? We have previously answered this question. . . . We find that the reasonableness or unreasonableness of rates charged or action taken by the board of directors of a public power district is a proper matter for judicial examination and review.'' There appears therefore to be no question in this jurisdiction that the trial court, in the first instance, and this court, on appeal, properly have jurisdiction to review the rates fixed by Wheat Belt. Were it otherwise, the action of a board such as Wheat Belt would not be subject to review. That simply could not be.

Having thus disposed of the preliminary matters, we turn to the merits of the case. The issue in this case is, to some extent, controlled by statute. Neb. Rev. Stat. § 70-655 (Reissue 1981) imposes upon Wheat Belt the duty of setting rates which ''shall be fair, reasonable, nondiscriminatory, and so adjusted as in a fair and equitable manner to confer upon and distribute among the users and consumers of commodities and services furnished or sold by the district the *benefits* of a successful and profitable operation and conduct of the business of the district.'' (Emphasis supplied.) That is, not only must the district, in establishing rates, do so in a manner which is fair, reasonable, and nondiscriminatory but it must likewise adjust the rates so as to confer *upon and among* the users of these services the benefits of

a successful and profitable operation. Obviously, the ingredients which go into making a successful and profitable operation are not isolated to a particular source or a particular date in time but, rather, come about by reason of a mixture of things. The rates to be charged users of electricity are a blend of both demand charges and energy charges and likewise are the melding of various sources available to Wheat Belt. While it is true that an entire class may be charged a rate other or different than another class, if indeed the increased cost of providing the service can be identified with that class, the class itself may not be subdivided dependent solely upon the date on which the service was provided. Were this to be otherwise, then a utility could impose upon a single, newly constructed building the entire cost of obtaining a new source of energy required by reason of the addition of the building to the service, even though the nature of the service is in all respects identical to all other commercial customers in the community. Such a rate formula is beyond comprehension. In *Erickson v. Metropolitan Utilities Dist.*, 171 Neb. 654, 667-68, 107 N.W.2d 324, 331 (1961), we said: " 'The rule forbidding unjust discrimination has been variously expressed: The charges must be equal to all for the same service under like circumstances. A public service corporation is impressed with the obligation of furnishing its service to each patron at the same price it makes to every other patron for the same or substantially the same or similar service. . . . "The common law upon the subject is founded on public policy which requires one engaged in a public calling to charge a reasonable and uniform price to all persons for the same service rendered under the same circumstances." ' " Permitting rates to be based upon the sole requirement that the utility must obtain additional energy would result in a chaotic rate formula which of necessity would discriminate. As we have asked, could a utility charge

a new building a higher rate simply because additional energy in the blend costs more than an early block? Or could a city charge individual homeowners who obtain similar service different rates based solely on the date they were connected to the system? We know of no authority to support that view. Likewise, one is hard pressed to imagine that if the next block of energy purchased by Wheat Belt should cost less than the current block of energy, the next newest customers of Wheat Belt would be charged a lower rate than the current users. That is obviously what the Legislature considered when it required a utility governed by Chapter 70, article 6, to confer upon and among the users the benefits of a successful operation. The benefits are to be conferred in a nondiscriminatory fashion. These benefits include the benefits of earlier-acquired lower cost energy.

This is not a case in which Wheat Belt has been compelled to expend capital funds to extend service to customers not previously receiving service. This is a question of Wheat Belt determining that the least expense block of power it purchases belongs to the first customers and the most expense block of power to the later customers, though Wheat Belt cannot show how or where any particular block of power is transmitted. The significance of this distinction was pointed out in the case of *Contractors & Builders Ass'n v. City of Dunedin*, 329 So. 2d 314 (Fla. 1976). The *City of Dunedin* case involved a challenge to a municipal ordinance dealing with water and sewer system connection fees. The amount of the connection charges varied depending upon the time at which the connection to the utility system was made. In striking down the charge the Florida court said at 320-21: "Users 'who benefit especially, not from the maintenance of the system, but by the extension of the system . . . should bear the cost of that extension.' *Hartman v. Aurora Sanitary District, supra*, 177 N.E.2d at 218. On the other hand, it

is not 'just and equitable' for a municipally owned utility to impose the entire burden of capital expenditures, including replacement of existing plant, on persons connecting to a water and sewer system after an arbitrarily chosen time certain.
. . . .
". . . For purposes of allocating the cost of replacing original facilities, it is arbitrary and irrational to distinguish between old and new ·users, all of whom bear the expense of the old plant and all of whom will use the new plant."

It is clear that as new users come on the line they are nevertheless required to pay for the cost of bonds issued for old plants already built which, if Wheat Belt's position is correct, presumably may not provide the new customers with any energy. Somehow there does not seem to be any hesitancy to impose upon new users costs which were incurred before they became users. Yet, in the instant case, there is some notion that the new user should be required to pay the greatest portion of the surcharge, even though the nature of the service being provided is identical between the two classes. Persons receiving similar service under similar circumstances cannot be charged for such service in an arbitrary, designed, dissimilar manner. Courts which have been called upon to review this matter have made a distinction between the cost of providing service not previously provided and source of service. See, *U.S. Steel Corp. v. Com., Public U. Com'n*, 37 Pa. Commw. 195, 390 A.2d 849 (1978); *Mountain States Legal Fn. v. Utah Pub. Serv.*, 636 P.2d 1047 (Utah 1981); *Utilities Com. v. Mead Corp.*, 238 N.C. 451, 78 S.E.2d 290 (1953); *State ex rel. DePaul Hosp. S. of N. v. Public Serv. Com'n*, 464 S.W.2d 737 (Mo. App. 1970); *State ex rel. McKittrick v. Public Service Comm.*, 352 Mo. 29, 175 S.W.2d 857 (1943). This is not to say that in a proper case a customer may not be charged for the additional cost of extending the service to a point where the service had not previ-

ously been provided. We do not pass on that issue. It is only to say that a dissimilar rate may not be imposed for similar service solely on the basis that the additional source of the power or energy is more costly than previous sources. All of the sources must properly be blended into a rate which results in all customers obtaining the same service under the same conditions being charged the same rate.

Wheat Belt argues that our earlier decision in *City of Scottsbluff v. United Tel. Co. of the West*, 171 Neb. 229, 106 N.W.2d 12 (1960), justifies its action in the present case. We believe Wheat Belt misreads the decision. In the *United Tel. Co.* case, the city of Scottsbluff enacted an ordinance imposing an occupation tax on the telephone company based upon service *in* Scottsbluff. The telephone company surcharged *all* of its customers *in* Scottsbluff a pro rata portion of the Scottsbluff-imposed occupation tax. The city objected and argued, in effect, that the telephone company was required to absorb the tax imposed in Scottsbluff. In approving the action of the telephone company, we merely said that if the city of Scottsbluff wished to raise funds by taxing the telephone company in its city, it was not discriminatory to require *all* of the users in the taxed area to pay the cost of the tax so imposed. That is not at all similar to the present case. We therefore find that the action of Wheat Belt in establishing two different subclasses of irrigation customers and asessing the bulk of the ratchet imposed by Tri-State against members of Rate Class 76 was arbitrary and discriminatory and must be set aside.

Having therefore found the rate invalid, we are now confronted with determining the proper relief to be granted. Members of Rate Class 76 have asked this court to render judgment for the members of Rate Class 76 in an amount equal to the difference between what members of Rate Class 75 paid and what members of Rate Class 76 paid. Were we to do that we would be in effect granting to members of

Rate Class 76 the same unjust and arbitrary rate which was granted to members of Rate Class 75 and which we have now declared invalid. Such relief is not appropriate in a case of this nature. Rate Class 76 has failed to recognize the difference between an overcharge and a discriminatory rate. The difference was carefully explained by the Supreme Court of Texas in *United Gas Corp. v. Shepherd Laundries, Inc.*, 144 Tex. 164, 170, 189 S.W.2d 485, 487-88 (1945), when the court said: "[A] discrimination may arise from a mere inequality in rates but an overcharge arises only where the rate charged is unreasonable in and of itself, irrespective of the rate exacted of others, or when it is in excess of the rate established for the particular customer or business. In a suit for overcharges the rate paid by others is immaterial. It is only in suits for damages for discrimination that rates charged others are important." The evidence in this case does not support a claim that the rate itself was unreasonable or included items not properly included. The problem here was that the proper costs were misallocated.

While there are cases to be found where damages such as requested by the plaintiffs herein have been awarded, they are cases generally where both a statute authorizes such damages and the evidence supports such damages. Neither factor is present in this case.

Our reading of the various cases decided throughout the United States on this issue convinces us that the proper action to take in a case of this nature, absent specific evidence of individual damages, is to require the board of directors of Wheat Belt to set a proper rate for the service rendered. This would permit Wheat Belt to exercise the expertise which is better left to it than to the courts, and in effect would require Wheat Belt to merely perform the duties imposed upon it under the provisions of § 70-655. That duty is to set a rate for the period in question which is fair, reasonable, and nondiscriminatory and which

confers upon and distributes among the users and consumers the benefits of a successful and profitable operation. The only way to do that is to require Wheat Belt to set a rate for members of Rate Class 75 and Rate Class 76 in the same amount and in the same fashion and to refund or credit to customers in Rate Class 76 any overcharge which may result. For that reason, we reverse and remand the instant case to the District Court with directions to order Wheat Belt to recompute the rate for the period in question in such amount as to impose charges upon members of Rate Class 75 and Rate Class 76 in an identical amount, and in a fair, equitable, and nondiscriminatory manner. We recognize, of course, that in doing this Wheat Belt is unable to collect additional charges from members of Rate Class 75 for the years already involved and will simply have to absorb those losses in future rates.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, J., participating on briefs.